No. 25 - _____

[FED. CL. No. 23-cv-1876C]

IN THE UNITED STATES COURT OF APPEALS

FOR THE FEDERAL CIRCUIT

112 GENESEE STREET, LLC, *et al*,

Plaintiffs-Appellees,

v.

THE UNITED STATES,

Defendant-Appellant.

PETITION FOR PERMISSION TO APPEAL AN INTERLOCUTORY
ORDER OF THE COURT OF FEDERAL CLAIMS
DATED JULY 24, 2024, IN CASE NO. 23-CV-1876
PURSUANT TO 28 U.S.C. § 1292(d)

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

WILLIAM J. GRIMALDI
Assistant Director

REBECCA S. KRUSER
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-2035
Email: rebecca.s.kruser@usdoj.gov
Attorneys for Defendant-Appellant

November 1, 2024

## <u>TABLE OF CONTENTS</u>

STATEMENT OF CONTROLLING QUESTION OF LAW ..................................... 1

STATEMENT OF THE CASE .............................................................................. 3

    I.    The Restaurant Revitalization Fund ................................................. 3

    II.   History Of The RRF Program........................................................... 5

REASONS FOR GRANTING THE PETITION ...................................................... 6

    I.  The Questions Presented Are Controlling Questions Of Law As To
        Which There Is Substantial Ground For Difference Of Opinion................... 7

    II.  Immediate Appeal Will Materially Advance The Ultimate Termination
         Of This Case.......................................................................................... 19

CONCLUSION......................................................................................................21

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                 **Page(s)**

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988) ...............................................................................*passim*

*Broughton Lumber Co. v. Yeutter,*
   939 F.2d 1547 (Fed. Cir. 1991) .......................................................14

*Coast Fed. Bank, FSB v. United States,*
   49 Fed. Cl. 11 (2001) ...........................................................7, 8, 19

*Crocker v. United States,*
   125 F.3d 1475 (Fed. Cir. 1997) .......................................................14

*Dancy v. United States,*
   229 Ct. Cl. 300 (1982)........................................................................7

*Doe No. 1 v. United States,*
   163 Fed. Cl. 608 (2023) ....................................................................7

*Doe v. United States,*
   463 F.3d 1314 (Fed. Cir. 2006) ..................................................11, 12

*Eastport S. S. Corp. v. United States,*
   372 F.2d 1002 (Ct. Cl. 1967) ..........................................................10

*In re Convertible Rowing Exerciser Patent Litigation,*
   903 F.2d 822 (Fed. Cir. 1990) ..........................................................6

*In re Duplan Corp.,*
   591 F.2d 139 (2d Cir. 1978)...............................................................7

*Katz v. Cisneros,*
   16 F.3d 1204 (Fed. Cir. 1994) ...................................................15, 16

*Laturner v. United States,*
   135 Fed. Cl. 501 (2017) ...................................................................20

*Lion Raisins, Inc. v. United States*,
    416 F.3d 1356 (Fed. Cir. 2005) ........................................................14

*Little River Lumber Co. v. United States*,
    7 Cl. Ct. 492 (1985) ........................................................................7

*Lummi Tribe v. United States*,
    870 F.3d 1313 (Fed. Cir. 2017) ......................................................9

*Martinez v. United States*,
    333 F.3d 1295 (Fed. Cir. 2003) ....................................................14

*Me. Cmty. Health Options v. United States*,
    590 U.S. 296 (2020) ................................................................*passim*

*Murphy v. United States*,
    993 F.2d 871 (Fed. Cir. 1993) ......................................................14

*Nat'l Ctr. for Mfg. Scis. v. United States*,
    114 F.3d 196 (1997) ........................................................................9

*Neb. Pub. Power Dist. v. United States*,
    74 Fed. Cl. 762 (2006) ................................................................. 7, 8

*Northrop Corp. v. United States*,
    27 Fed. Cl. 795 (1993) ............................................................... 7, 19

*Perri v. United States*,
    340 F.3d 1337 (Fed. Cir. 2003) ............................................... 11, 12

*Reid v. United States*,
    149 Fed. Cl. 328 (2020) ................................................................20

*Samish Indian Nation v. United States*,
    419 F.3d 1355 (Fed. Cir. 2005) ............................................... 11, 12

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*,
    480 F.3d 1116 (Fed. Cir. 2007) ............................................... 16, 17

*Tidewater Oil Co. v. United States*,
    409 U.S. 151 ( 1972) ........................................................................6

*United States v. White Mountain Apache Tribe*,
  537 U.S. 465 (2003) .............................................................................8

*W6 Rest. Grp., Ltd. v. Guzman*,
  No. 1:21-CV-2361, 2024 WL 1973132 (N.D. Ohio May 3, 2024) ....................... 12, 13


## Statutes

15 U.S.C. § 9009c ...........................................................................2, 3, 12

15 U.S.C. § 9009c(a) ............................................................................ 3, 4

15 U.S.C. § 9009c(b) ........................................................................4, 5, 10

15 U.S.C. § 9009c(c) ..........................................................................*passim*

28 U.S.C. § 1292(b) ..................................................................................7

28 U.S.C. § 1292(d) ...........................................................................*passim*

28 U.S.C. § 1631 ......................................................................................7

American Rescue Plan Act of 2021,
  Pub. L. No. 117-2, March 11, 2021, 135 Stat. 4 (2021) .................................3

Fiscal Responsibility Act,
  Pub. L. No. 118-5, June 3, 2023, 137 Stat. 10 (2023) ....................................5


## Rules

Fed. R. App. P. 5 .....................................................................................1


## Other Authorities

*Fed. Practice & Procedure* § 3930...........................................................19

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

| | | |
|---|---|---|
| 112 GENESEE STREET, LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | No. 25 - _____ |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

## PETITION FOR PERMISSION TO APPEAL

Pursuant to 28 U.S.C. § 1292(d)(2) and Rule 5 of the Federal Rules of Appellate Procedure, the United States respectfully petitions this Court for permission to appeal an interlocutory order of the Court of Federal Claims (trial court) entered on July 24, 2024. Appx1-34. On October 24, 2024, the trial court amended its July 24, 2024 order to reflect that this case satisfies the criteria for appeal pursuant to 28 U.S.C. § 1292(d)(2). Appx35-42.

## STATEMENT OF CONTROLLING QUESTION OF LAW

On October 25, 2023, plaintiffs, 303 businesses in the restaurant industry, brought suit at the Court of Federal Claims. The complaint details a variety of alleged errors by SBA in its administration of the RRF program. In order to ostensibly come within the Court of Federal Claims' Tucker Act jurisdiction, plaintiffs allege that section 9009c(c)(1), a provision stating that the SBA Administrator "shall award grants to eligible entities in the order in which applications are received," is money-

1

mandating.  However, plaintiffs do not simply claim that they submitted eligible applications that the statute required SBA to approve.  Instead, they put forth an indirect theory that section 9009c(c)(1) required SBA to award RRF grants in the order that applications were received and that SBA's decision to award grants instead in the order that applications were processed, along with other issues, caused the money to be "misallocated."  Plaintiffs repeatedly attribute the fact that they did not receive RRF grants to SBA's alleged unlawful, arbitrary, capricious, and negligent acts or omissions, in particular its use of the order processed, not the order received, to distribute funds.

On February 26, 2024, we moved to dismiss for lack of subject-matter jurisdiction, primarily because the statute is not money-mandating.  After oral argument, the trial court requested supplemental briefing as to whether plaintiffs failed to state a claim.  In that briefing, we argued that plaintiffs failed to state a claim because the Government's liability was capped at $28.6 billion, the statutory "covered period" had ended, and the Fiscal Responsibility Act had rescinded unobligated funds. On July 24, 2024, the trial court issued an opinion and accompanying order denying our motion.  Appx1-34.  The trial court held both that it possesses subject-matter jurisdiction and that plaintiffs have stated a claim upon which relief can be granted.

We seek permission to appeal two questions relating to the interlocutory order: (1) whether 15 U.S.C. § 9009c is a money-mandating statute authorizing suits for damages in the Court of Federal Claims; and (2) whether plaintiffs fail to state a claim

upon which relief can be granted in light of statutory limits on the Government's

liability.  We respectfully request that the Court reverse the trial court's holding that

15 U.S.C. § 9009c is money-mandating or reverse the trial court's holding that

plaintiffs' complaint states a claim upon which relief can be granted.

## STATEMENT OF THE CASE

## I.    The Restaurant Revitalization Fund

This case concerns the Restaurant Revitalization Fund (RRF), a fund created by

Congress and overseen by the Small Business Administration (SBA) to give assistance

to restaurants struggling during the COVID-19 pandemic.  Congress created the RRF

as part of the American Rescue Plan Act of 2021 (ARPA), Pub. L. No. 117-2, 135

Stat. 4 (2021), which was enacted on March 11, 2021.  Specifically, the RRF is

contained in Section 5003 of ARPA (later codified at 15 U.S.C. § 9009c), which

describes the purpose of the RRF as providing money to "eligible entities" for

"pandemic-related revenue loss" caused by the COVID-19 pandemic.  15 U.S.C. §§

9009c(a)(4), (7).

Eligible entities were defined to include restaurants and other similar business

types in which food or drinks are served, but excluded State or local government-

operated business, entities with more than 20 locations, entities that had applied for or

received another type of SBA grant, or publicly-traded companies.  *See id.* at §

9009c(a)(4).  For eligible entities that were open and operating for the entirety of

2019, the pandemic-related revenue loss was defined simply as the entity's 2020 gross

3

receipts subtracted from its 2019 gross receipts.  *See id.* at § 9009c(a)(7).  Eligible entities could receive grants equal to their pandemic-related revenue loss up to an aggregate maximum of $10 million, with no more than $5 million per physical location.

The statute included a "covered period" beginning on February 15, 2020, and ending "on December 31, 2021, or a date to be determined by the Administrator that is not later than 2 years after March 11, 2021."  *Id.* at § 9009c(a)(3).  The SBA Administrator exercised this authority and the "covered period" thus ended on March 11, 2023.  During the "covered period," eligible entities were permitted to use grant awards on certain broad categories of expenses.  *See* 15 U.S.C. § 9009c(c)(5). Crucially, the statute also contained a provision regarding the return of funds, which was tied to the "covered period."  If an eligible entity failed "to use all grant funds" or "permanently cease[d] operations on or before the last day of the covered period," the eligible entity "shall return to the Treasury any funds that the eligible entity did not use . . . ."  *See id.* at § 9009c(c)(6).

To fund the RRF, Congress provided that "[i]n addition to amounts otherwise available, there is appropriated to the [RRF] for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $28,600,000,000, to remain available until expended."  15 U.S.C. § 9009c(b)(2)(A).  In terms of distributing this money, the statute stated that the SBA Administrator "shall use amounts in the Fund to make grants described in subsection (c)."  *Id.* at § 9009c(b)(3).  This subsection (c) contains

4

the statement that "the Administrator shall award grants to eligible entities in the order in which applications are received by the Administrator." *Id.* at § 9009c(c)(1).

## II.    History Of The RRF Program

SBA began accepting applications on May 3, 2021.  Entities could apply through an online portal, a telephone call center, or through five point-of-sale electronic systems used in the restaurant industry.  SBA decided to stop accepting any applications on May 24, 2021, due to overwhelming demand that rapidly dwarfed the allocated amount of funds.  SBA processed and made awards through June 30, 2021. On July 2, 2021, SBA announced that the RRF fund was exhausted.

During this period, SBA initiated the *processing* of applications based on the date and time an application was electronically signed and submitted.  However, not all applications took the same time to process.  Some applications were more complex or had errors or omissions that SBA allowed applicants to correct.  SBA did not give out grant funds in strict line order, with the first applicant receiving an award before the second and all subsequent applicants.

On March 11, 2023, the statutory "covered period" expired.  On June 3, 2023, the Fiscal Responsibility Act became law.  *See* Pub. L. No. 118-5, 137 Stat. 10.  As part of a bipartisan agreement to suspend the public debt limit through January 1, 2025, the Fiscal Responsibility Act rescinded unobligated funds from at least eighty-one different Federal programs, including the RRF.  *See id.* § 52, 137 Stat. at 28 ("The

unobligated balances of amounts made available by section 5003(b)(2)(A) of Public

Law 117-2 are hereby permanently rescinded.").

## REASONS FOR GRANTING THE PETITION

Section 1292(d)(2) of Title 28 provides:

> [W]hen any judge of the United States Court of Federal
> Claims, in issuing an interlocutory order, includes in the
> order a statement that a controlling question of law is
> involved with respect to which there is a substantial ground
> for difference of opinion and that an immediate appeal
> from that order may materially advance the ultimate
> termination of the litigation, the United States Court of
> Appeals for the Federal Circuit may, in its discretion,
> permit an appeal to be taken from such order, if application
> is made to that Court within ten days after the entry of
> such order.

28 U.S.C. § 1292(d)(2).  This rule reflects the view that "interlocutory appeals

involving important and controlling questions of law are a useful means of expediting

litigation." *Tidewater Oil Co. v. United States,* 409 U.S. 151, 179 ( 1972).  Acceptance of

the appeal is within this Court's discretion.  *In re Convertible Rowing Exerciser Patent

Litigation,* 903 F.2d 822 (Fed. Cir. 1990).

The standards for interlocutory appeal under 28 U.S.C. § 1292(d)(2) are easily

met in this case.  The trial court correctly determined that its order presents a

"controlling question of law" as to which "there is a substantial ground for difference

of opinion," and that an immediate appeal "may materially advance the ultimate

termination of the litigation."  Appx35-42.

## I.    The Questions Presented Are Controlling Questions Of Law As To Which There Is Substantial Ground For Difference Of Opinion

The first factor for determining whether an interlocutory order is ripe for appeal is whether it involves a controlling question of law.  A question of law is "controlling" when resolving it would "materially affect issues remaining to be decided in the trial court." *Doe No. 1 v. United States*, 163 Fed. Cl. 608, 612 (2023) (quoting *Coast Fed. Bank, FSB v. United States*, 49 Fed. Cl. 11, 13 (2001)); *Neb. Pub. Power Dist. v. United States*, 74 Fed. Cl. 762, 763 (2006).  Whether a "question of law" is "controlling" is closely related to whether its resolution would "materially advance the ultimate termination of the litigation." *In re Duplan Corp.*, 591 F.2d 139, 148 n.11 (2d Cir. 1978).[1]

The first certified question is plainly relevant to the fundamental scope of the trial court's subject-matter jurisdiction.  If this Court were to agree with our position that section 9009c is not money-mandating and therefore outside of the scope of the Tucker Act's waiver of sovereign immunity, plaintiffs' complaint must be dismissed.[2]

---

[1]  Cases decided under section 1292(b) (for interlocutory appeals of district court orders) are persuasive authority because "the operative language and functions of Section 1292(d)(2)" are identical.  *Northrop Corp. v. United States*, 27 Fed. Cl. 795, 798 (1993).

[2]  Although it could potentially be transferred to district court, *see* 28 U.S.C. § 1631, it would not be in the interest of justice to do so because such a transfer would be futile.  *See Little River Lumber Co. v. United States*, 7 Cl. Ct. 492, 494 (1985) (citing *Dancy v. United States*, 229 Ct. Cl. 300, 308 (1982)).  Several district courts have held that similar plaintiffs lack standing or the matter is moot due to the completion of the RRF program.

Similarly, even if this Court were to find that the trial court possesses subject-matter jurisdiction, a holding that plaintiffs fail to state a claim upon which relief can be granted would require dismissal of this case. Resolution of these questions, separately or together, would thus materially affect the issues remaining to be decided. Therefore, they constitute controlling questions of law.

There are substantial grounds for difference of opinion with the trial court's rulings on these controlling legal issues. A "substantial ground for a difference of opinion" on a controlling question of law typically arises when the decision (1) is in tension with other decisions from other courts, or (2) involves a novel issue or one of first impression. *Coast Fed. Bank, FSB v. United States*, 49 Fed. Cl. 11, 13 (2001)). A substantial ground for difference of opinion does not require a "full blown intracircuit or intercircuit conflict[]"; rather, a "healthy tension" among decisions is sufficient. *Neb. Pub. Power*, 74 Fed. Cl. at 764.

With respect to the trial court's decision that section 9009c(c)(1) is money mandating, there are several reasons why the decision is erroneous or, at a minimum, there is a substantial ground for difference of opinion on that question. First, it conflicts with this Court's binding precedent regarding grant programs. A statute is only money-mandating if it "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003). The Supreme Court has indicated that statutes requiring payment of forward-looking grants are not money-mandating. *See Me. Cmty.*

8

*Health Options v. United States*, 590 U.S. 296, 326-27 (2020) (discussing *Bowen v. Massachusetts*, where "the pertinent Medicaid provision was a 'grant-in-aid program'" and was deemed non-money-mandating). Similarly, this Court has held that a statute requiring grants to Indian tribes is not money-mandating. *Lummi Tribe v. United States*, 870 F.3d 1313, 1318-19 (Fed. Cir. 2017) (holding on interlocutory appeal that a statute requiring grants to Indian tribes could not be analogized to a damages claim and was not money-mandating). This Court has also held that it lacked jurisdiction over a grantee's suit demanding the full amount of funds set aside for it by Congress. *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 200 (1997) (dismissing for lack of jurisdiction a grantee's suit demanding funds because the grantee was "seeking funds to which it claims it is entitled under a statute," and not "money in compensation for losses that it has suffered or will suffer as a result of the withholding of those funds.").

The RRF grants could be used for only certain purposes and were intended to assist restaurants weather the pandemic, not compensate restaurants for "past injuries or labors." *Me. Cmty.*, 590 U.S. at 325; *Lummi Tribe*, 870 F.3d at 1318-19; *Nat'l Ctr.*, 114 F.3d at 200. Yet plaintiffs seek a "naked money judgment[,]" unrestricted by the limitations of the grant statute that they invoke. *Nat'l Ctr.*, 114 F.3d at 201. Accordingly, under *Lummi Tribe* and *National Center*, the RRF statute is not money-mandating, and the decision in this matter is in conflict with this binding precedent.

9

This jurisdictional barrier is even more compelling here given the unique structure of the RRF statute. To the Government's knowledge, it is an issue of first impression whether a statute is money-mandating when it states that an agency "shall award grants to eligible entities," but then qualifies that phrase with an instruction as to how to disburse funds. The trial court cannot hear "any and all pecuniary claims against the Federal Government," even if they "rely upon" an "aspect of federal, constitutional, statutory or regulatory law." *Eastport S. S. Corp. v. United States*, 372 F.2d 1002, 1008 (Ct. Cl. 1967).

The most recent application of this test was provided by the Supreme Court in *Maine Community Health.* In that case, the Supreme Court found the "mandatory text" of section 1342 of the Affordable Care Act to be "significant." 590 U.S. at 324. In particular, the Supreme Court referenced section 1342's "triple mandate" that the agency "shall establish and administer" the program, "shall provide" for payment according to the statutory formula, and "shall pay" qualifying insurers and found that these features put the statute "comfortably within" the class of money-mandating statutes. *Id.* at 324-25.

In the instant matter, the trial court stated that it was relying on the "shall use" and "shall award" language in section 9009c(b)(3) and (c)(1) "to find the statute money-mandating by its plain terms." Appx23. However, the trial court also acknowledged that the statute "does not literally command payment to all eligible entities." Appx22. In the Government's view, section 9009c may contain mandates

10

related to the establishment and administration of the RRF program, which go to the first part of the "triple mandate," but does not actually contain language requiring payment to all eligible applicants or any specified subset of eligible applicants. The trial court thus erroneously found this statute to meet the Supreme Court's conception of a money-mandating statute as set forth in *Maine Community Health* and there is certainly substantial ground for difference of opinion on this conclusion.

Second, this case presents an issue of first impression regarding the import of this Court's holdings addressing discretionary payment schemes. In its opinion, the trial court considered the statutory language to be sufficiently non-discretionary as to mandate payment but also discussed this Court's cases setting forth when an apparently discretionary statute can be money-mandating. Appx17-23. The trial court stated that "[e]ven if this language simply authorized the Administrator to make awards, section 9009c would still be money-mandating because it would meet each of the three prongs of the test for determining if a discretionary statute is money-mandating." Appx23. As this Court explained in *Samish Indian Nation*, discretionary schemes that support claims within the Court of Federal Claims' jurisdiction include statutes "(1) that provide 'clear standards for paying' money to recipients; (2) that state the 'precise amounts' that must be paid; or (3) as interpreted, compel payment on satisfaction of certain conditions." *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364-65 (Fed. Cir. 2005) (quoting *Perri v. United States*, 340 F.3d 1337, 1342-43 (Fed. Cir. 2003)); *see also Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006).

11

The instant case presents a distinct factual situation and different statutory wording from the cases in which this test has been previously applied. Here, plaintiffs are not simply arguing that SBA failed to provide them grants, but that they missed out on receiving grants because SBA wrongfully gave the money to other entities by using an incorrect payment order. The trial court agreed and held that section 9009c(c)(1) "establishes an individual right for eligible entities to receive awards based on, with limited exceptions, a first-come, first served basis." Appx19. The trial court also stated that the order "gave each eligible applicant an individual right to receive payment before any later applicant." Appx22. But the Government is unaware of any decision of this Court that has applied *Samish Indian Nation* or similar cases to find such an "individual right" to receive money from the Government based on a claimed failure of an agency in administering a program. The language of section 9009c does not contain language requiring payment to all eligible applicants or any specified subset of eligible applicants. This novel application of *Samish Indian Nation*, *Perri*, and *Doe* supports interlocutory review by this Court.

Third, the trial court's reasoning regarding the scope of the Tucker Act and the APA waivers of sovereign immunity presents substantial grounds for difference of opinion. The trial court's opinion is in tension with the fact that other cases challenging the administration of the RRF have been filed in the United States district courts. The *W6 Restaurant Group* case, in particular, suggests a substantial ground for difference of opinion with the trial court's jurisdictional ruling here. In that case, the

12

plaintiffs asserted an APA claim that SBA failed to comply with 15 U.S.C.

§ 9009c(c)(1) "because the SBA did not process applications for RRF grants in the

order in which they were received[.]" *W6 Rest. Grp., Ltd. v. Guzman*, No. 1:21-CV-

2361, 2024 WL 1973132, at *2 (N.D. Ohio May 3, 2024). The plaintiffs sought

injunctive relief compelling SBA "to process all applications in the order in which

they were received" and to implement policies for the return and redistribution of

"improvidently granted funds" to eligible RRF applicants. *Id.* Although framed as

injunctive relief, the plaintiffs obviously believed that any such order by the district

court could cause them to receive money from SBA.

The district court dismissed for lack of jurisdiction for two reasons. First, the

plaintiffs did not have standing under the APA to challenge SBA decisions not to

bring enforcement actions against the alleged wrong RRF grant recipients. *Id.* at *3-

*4. Second, to the extent that plaintiffs' request went beyond seeking review of SBA's

enforcement decisions, the district court found the case to be moot due to the

expiration of the statutory "covered period" and the passage of the Fiscal

Responsibility Act. *Id.* at *9. None of the parties suggested that the case properly

belonged at the Court of Federal Claims under the Tucker Act or doubted that a

challenge to SBA's asserted failure to comply with section 9009c(c)(1) was an APA

matter.[3]

---

[3] We have recently become aware that another group of restaurants intends to file
a new case at the Court of Federal Claims based on the trial court decision. This

Review by this Court will thus avoid potential tension with district court decisions.  This Court has repeatedly and expressly held that the trial court does not possess jurisdiction over APA claims.  *See Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1370 n. 11 (Fed. Cir. 2005); *Martinez v. United States*, 333 F.3d 1295, 1313 (Fed. Cir. 2003); *Crocker v. United States*, 125 F.3d 1475, 1476 (Fed. Cir. 1997); *Murphy v. United States*, 993 F.2d 871, 874 (Fed. Cir. 1993).  However, the trial court held that this case presents an "instance of concurrent jurisdiction" with the district courts.  Appx14.  The cases cited by the trial court for this proposition are not apposite.  Notably, *Broughton Lumber Co. v. Yeutter* addressed that district courts may have concurrent jurisdiction with the Court of Federal Claims in some specialized instances, not that the Court of Federal Claims routinely shares district court jurisdiction.  *See id.* (citing 939 F.2d 1547, 1551, 1551 n.2 (Fed. Cir. 1991)).  The other cases cited by the trial court similarly addressed statutes specifically granting the district courts jurisdiction, such as for tax refunds and claims seeking less than $10,000.  Interlocutory review is therefore necessary for this Court to address the proper forum for a claim based on SBA awarding grants in an allegedly incorrect order to avoid erroneous expansion of the Court of Federal Claims jurisdiction into APA-type claims.

---

further demonstrates that this Court should clarify the relevant jurisdictional boundaries.

Furthermore, the trial court here found it relevant to the jurisdictional analysis that relief has not been available under the APA in the district courts and that in the absence of available APA remedies, the Tucker Act would provide "likely the only available remedy" for plaintiffs' claims. Appx11. However, a lack of available remedy elsewhere is not determinative of the trial court's jurisdiction. This holding would make the trial court a backup forum for litigants to repackage and reassert non-redressable or defective APA claims. In order to avoid potential tension between the Court of Federal Claims and the district courts, this Court should address whether this statute indeed presents an area of concurrent jurisdiction with the district courts and if a lack of available equitable relief in district court is relevant to the jurisdiction of the trial court.

Fourth, the trial court's ruling on the scope of the Tucker Act is in tension with this Court's decision in *Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994), which is based on the Supreme Court's decision in *Bowen v. Massachusetts,* 487 U.S. 879 (1988). In *Bowen*, the Supreme Court held that a claim by the Commonwealth of Massachusetts challenging the refusal of the Secretary of Health and Human Services to reimburse it for funds it expended under a Medicaid program was properly brought in district court as an APA claim. Although the State sought payment, the Supreme Court held that the matter "is not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit

seeking to enforce the statutory mandate itself, which happens to be one for the payment of money." *Bowen*, 487 U.S. at 900 (emphasis in original).

This Court followed *Bowen* in *Katz*, in which Mr. Katz appealed an order of a district court transferring his case to the Court of Federal Claims. Mr. Katz, a private developer, challenged the government's interpretation of Department of Housing and Urban Development (HUD) regulations that were used to calculate rent that would be paid to his company pursuant to a contract with a public housing agency. *Katz*, 16 F.3d at 1207. The district court determined that the case belonged in the Court of Federal Claims because it involved a government contract. *Id.* This Court reversed, holding that Mr. Katz "does not seek money as compensation for a loss suffered." *Id.* at 1208. Rather, he sought to "compel HUD to perform the calculation of contract rents" in accordance with its regulations. *Id.* "That a payment of money may flow from a decision that HUD has erroneously interpreted or applied its regulation does not change the nature of the case." *Id.*

The trial court here identified an "effort to limit *Bowen* to the nature of the underlying statutory regime at issue" in this Court's decisions *Suburban Mortgage Associates* and *Consolidated Edison*. Appx12. However, these cases are distinguishable because they addressed plaintiffs relying on *Bowen* to obtain district court jurisdiction and avoid the jurisdiction of the Court of Federal Claims (and also appellate review by this Court). By contrast, in *Katz*, this Court applied *Bowen* to a dispute over the proper amount of contract rent owed by regulation to a housing developer that did not

16

involve any of the distinctive circumstances present in *Bowen*. *Katz* has never been called into question or overruled and remains good law.

The trial court also erroneously concluded that the Supreme Court's decision in *Maine Community Health*, and the two grounds upon which it distinguished *Bowen,* support jurisdiction. Appx13. In *Maine Community Health*, the Supreme Court noted that the nature of the relief sought in *Bowen* was not merely for past due sums, but for an injunction to correct the method of calculating payments going forward. *Id.* The Supreme Court also stated that the APA "is tailored" to "[m]anaging the relationships between States and the Federal Government that occur over time and that involve constantly shifting balance sheets," while the Tucker Act is suited to "remedy[ing] particular categories of past injuries or labors for which various federal statutes provide compensation." *Id.* at 327 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 905-05 n.39 (1988)).

Here, the trial court accepted plaintiffs' characterization of their claims as only requesting a "one time payment of damages for grants that they contend they are owed but did not receive" that would not require any ongoing or prospective relationship with SBA. Appx13. The trial court did not heed this Court's caution that, to thwart forum-shopping, "in determining whether a plaintiff's suit is to be heard in district court or the Court of Federal Claims, we must look beyond the form of the pleadings to the substance of the claim." *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007). The trial court's

17

ruling would require SBA to prospectively put all applicants in a new, "corrected" order based on time of application submission. Once this is done, SBA will need to review a large subset of all applications to figure out which entities, including the plaintiffs individually, "should have" received grants and thus at what point the $28.6 billion would have been expended in this counterfactual scenario. The trial court's decision essentially requires SBA to come up with a new list of eligible awardees, which may or may not include all plaintiffs. By contrast, in *Maine Community Health*, the statute aimed to compensate insurers for losses that had already occurred.

Therefore, plaintiffs do not seek money damages for a past injury or labor, but instead as part of a determination that SBA awarded grants using an incorrect statutory interpretation. Plaintiffs seek to create a new relationship with SBA prospectively by obtaining a determination that they should have received grants. To reach its decision on the scope of the Tucker Act versus the APA, the trial court was required to address the parties' competing interpretations of *Maine Community Health* and *Bowen*. There is thus a substantial ground for difference of opinion as to where the line between these two waivers of sovereign immunity, with the trial court agreeing with plaintiffs' expansive view.

Finally, with regard to whether plaintiffs state a claim upon which relief can be granted, the distinctive wording of the statute raises the novel question of whether 15 U.S.C. § 9009c caps the funds authorized for the RRF and, if so, whether such a cap limits the Government's liability to the funds already spent on grants to other

applicants.  *See* Appx36.  The trial court explained that under relevant precedents "the plaintiffs were seeking damages under the Tucker Act because Congress had failed to appropriate sufficient funds to pay the full amounts of its outstanding obligations; there was no question as to whether the government had made improper payments to undeserving applicants in violation of federal law."  Appx32.  The trial court reviewed the Supreme Court's decision in *Maine Community Health* and this Court's decisions in *Star-Glo*, *Greenlee County*, and *Prairie County*.  Appx29-32.  The trial court found that "[e]xisting caselaw does not extend to this scenario, and it appears to be a question of first impression."  Appx33.  The trial court found it significant that there was an "absence of caselaw holding that a plaintiff cannot state a claim under these circumstances" and indicated that "[w]ithout applicable precedent foreclosing them, the plaintiffs' claims may proceed on the merits."  Appx2, Appx33.  The trial court noted that the statute was "unusual" and "ambiguous" in its wording.  Appx29.  An interlocutory appeal would thus be appropriate to resolve this issue of first impression and lack of analogous precedent.

## II.    Immediate Appeal Will Materially Advance The Ultimate Termination Of This Case

An interlocutory appeal "materially advance[s] the ultimate termination of [a] case" when immediate appellate resolution may save judicial and party resources by resolving what, if any, claims may proceed.  *Coast Fed. Bank*, 49 Fed. Cl. at 14 (citing *Northrop Corp. v. United States*, 27 Fed. Cl. 795, 800-01 (1993)).  The question focuses

"in large part[,] on considerations of 'judicial economy' and the need to avoid 'unnecessary delay and expense' and 'piecemeal litigation.'" *Reid v. United States*, 149 Fed. Cl. 328, 331 (2020) (quoting *Coast Fed. Bank*, 49 Fed. Cl. at 14).  Furthermore, courts should consider a variety of factors, including the appeal's potential to accelerate or simplify trial-court proceedings, the burdens associated with discovery, and the potential impact of appellate resolution on related cases.  *Fed. Practice & Procedure* § 3930; *see also Laturner v. United States*, 135 Fed. Cl. 501, 505-06 (2017) (certifying order, in part, when an immediate appeal could obviate contentious and protracted discovery).

If the Court accepts the appeal and reverses on either controlling legal question, the trial court and the parties will avoid unnecessary delay, expense, and piecemeal litigation.  Before the parties engage in discovery, it would be beneficial for the parties obtain a definitive ruling on appeal on whether this matter is even within the trial court's jurisdiction and whether plaintiffs can state a claim.  Proceeding to the merits now would require the parties to review a large number of applications, expend time and effort configuring a submission time order list of applicants, and determine if there was some other reason that a plaintiff did not receive a grant, separate from submission order, taking a variety of factual concerns into account.  The interests of the parties and of judicial economy would not be served by proceeding to the merits of the case and resolving these or other issues through discovery, motions practice,

experts, and trial, and then raising the controlling legal issues again in a post-judgment appeal years from now.

## CONCLUSION

For these reasons, we respectfully request the Court to grant this petition for permission to appeal an interlocutory order under 28 U.S.C. § 1292(d)(2).

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ William J. Grimaldi
WILLIAM J. GRIMALDI
Assistant Director

/s/ Rebecca S. Kruser
Rebecca S. Kruser
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-2035
Email: rebecca.s.kruser@usdoj.gov
November 1, 2024                    Attorneys for Defendant-Appellant

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion complies with the word limit of Federal Rule of Appellate Procedure 5(c)(1) and Federal Circuit Rule 5 because the motion was generated by a computer and contains 5,180 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f). I further certify that this motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared using Microsoft Word 2013 in a proportionally spaced typeface, 14-point Garamond font.

/s/ Rebecca S. Kruser
Rebecca S. Kruser

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2024, I filed the foregoing petition using

the appellate CM/ECF system and caused copies of the petition to be sent to the

following counsel by U.S. mail and electronic mail:

F. Greg Bowman
Ed Reddington
Williams & Connolly LLP
680 Maine Avenue, S.W.,
Washington, DC  20024
FBowman@wc.com
EReddington@wc.com

/s/ Rebecca S. Kruser
Rebecca S. Kruser

# ADDENDUM

## INDEX TO ADDENDUM

Opinion and Order (July 24, 2024)................................................................. Appx1

Memorandum Opinion granting certification
(October 24, 2024) ......................................................................................Appx35

Amended Order (October 24, 2024)............................................................. Appx42

Docket Sheet .................................................................................................Appx43

# In the United States Court of Federal Claims

No. 23-1876C
Filed: July 24, 2024
FOR PUBLICATION

---

**112 GENESEE STREET, LLC, et al,**

    *Plaintiffs,*

**v.**

**UNITED STATES,**

    *Defendant.*

---

*F. Greg Bowman*, Williams & Connolly LLP, Washington, D.C., with *Edward Reddington* and *Robel Yared*, of counsel, for the plaintiff.

*Rebecca S. Kruser*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for the defendant.

## MEMORANDUM OPINION

***HERTLING*, Judge**

  In March 2021, Congress enacted the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. No. 117-2, 135 Stat. 4 (2021), which, among other things, created the Restaurant Revitalization Fund ("RRF" or the "Fund"). The RRF was administered by the Small Business Administration ("SBA"). The SBA was to make grants to qualifying entities from the RRF to assist them to remedy the harms caused by the COVID-19 pandemic.

  The plaintiffs are 303 restaurant, bar, and catering businesses. They have sued the United States, acting through the SBA, claiming that they were entitled to receive grants under the RRF. The plaintiffs seek monetary damages equal to the amounts sought in their unpaid grant applications. They allege they are entitled to these payments because 15 U.S.C. § 9009c(c)(1) required the SBA to "award grants to eligible entities in the order in which applications are received by the Administrator," but the SBA instead made payments to applicants in the order in which it processed the applications. The plaintiffs allege that, had the SBA made the grants in the order the applications were received, sufficient funds would have been left for them to receive grants. The plaintiffs also base their claims in part on factual allegations of unlawful,

negligent, and/or arbitrary and capricious acts and omissions by the SBA.[1]  These actions and omissions, the plaintiffs allege, resulted in the improper payment of grants to the awardees, further depleting the funds that should have been used to pay grants to the plaintiffs.

The defendant has moved to dismiss under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC").  According to the defendant, the plaintiffs' claims are beyond the jurisdiction of the Court of Federal Claims because: (1) the plaintiffs lack standing due to a lack of redressability for their alleged injury; (2) their claims are moot; (3) 15 U.S.C. § 9009c is not money-mandating and cannot support a claim under the Tucker Act; and (4) the court lacks jurisdiction over claims of arbitrary and capricious as well as negligent conduct by the SBA.  The defendant argues further that transfer to a district court would be futile because suits in district courts seeking RRF grants under the Administrative Procedure Act ("APA") have been rejected.  At oral argument, the Court *sua sponte* raised the question of whether 15 U.S.C. § 9009c caps the funds authorized for the RRF and, if so, whether such a cap limits the defendant's liability to the funds already spent, thereby preventing the plaintiffs from stating a claim for relief under Rule 12(b)(6).  The parties were directed to file supplemental briefs on that issue.

The defendant's motion to dismiss is denied.  The plaintiffs have properly brought their claim under the Tucker Act for damages under a money-mandating statute.  The plaintiffs' claims are not moot because the plaintiffs seek recovery from the Judgment Fund, and such funds would redress their alleged injuries.

The plaintiffs have also successfully stated a claim.  To be sure, there is caselaw establishing that Congress can limit the government's liability for damages under statutes that authorize grant programs to the specific amounts set forth in those statutes.  Such a cap is not present here because, although 15 U.S.C. § 9009c only requires using money in the RRF to award grants, it does not cap the defendant's liability as to the plaintiffs' claims that the defendant awarded grants in a manner that was contrary to the express command of the statute.  Even if the defendant's liability were capped, the relevant precedents in which a liability cap was essential to the decision involved claims in which the plaintiffs sought the difference between the amounts authorized under the statutes creating the grant programs and the amount of money Congress had therefore appropriated.  The plaintiffs, in contrast, are seeking damages because they allege the SBA violated Congress' express directive by using funds that should have been paid to the plaintiffs instead to make awards to the wrong applicants.  The plaintiffs' claims are of a different nature than the claims rejected in prior cases on which the defendant relies in seeking dismissal and are *sui generis*.  Without applicable precedent foreclosing them, the plaintiffs' claims may proceed on the merits.

---

[1] Although the plaintiffs collectively only bring one cause of action, contained within that action are 303 distinct claims, one for each plaintiff.  This opinion, therefore, refers interchangeably to the plaintiffs' claim or claims.

**Appx2**

## I.     BACKGROUND

### A.     Factual and Legal Background

On March 11, 2021, Congress created the RRF pursuant to section 5003 of ARPA, later codified as 15 U.S.C. § 9009c, to compensate "eligible entities" for "pandemic-related revenue loss" caused by the COVID-19 pandemic according to a formula provided in the statute. 15 U.S.C. § 9009c(a)(4), (7).  Eligible entities were broadly defined:

> The term "eligible entity" —
>
> (A) means a restaurant, food stand, food truck, food cart, caterer, saloon, inn, tavern, bar, lounge, brewpub, tasting room, taproom, licensed facility or premise of a beverage alcohol producer where the public may taste, sample, or purchase products, or other similar place of business in which the public or patrons assemble for the primary purpose of being served food or drink;
>
> (B) includes an entity described in subparagraph (A) that is located in an airport terminal or that is a Tribally-owned concern; and
>
> (C) does not include—
>
>> (i) an entity described in subparagraph (A) that—
>>
>>> (I) is a State or local government-operated business;
>>>
>>> (II) as of March 13, 2020, owns or operates (together with any affiliated business) more than 20 locations, regardless of whether those locations do business under the same or multiple names; or
>>>
>>> (III) has a pending application for or has received a grant under section 9009a of this title; or
>>
>> (ii) a publicly-traded company.

*Id.* § 9009c(a)(4).

The definition of the term "pandemic-related revenue loss" varies based on when an eligible entity initially opened and whether it was continuously in operation in 2019.  For entities that were open and operating for the entirety of 2019, "pandemic-related revenue loss" was defined as an entity's 2020 gross receipts subtracted from its 2019 gross receipts.  *Id.* § 9009c(a)(7).  For other entities, section 9009c(a)(7) provided different formulas to define "pandemic-related revenue loss," but also alternatively included in the definition "an amount based on a formula determined by the Administrator" for each different defined entity.

Under the RRF, eligible entities could receive grants equal to their pandemic-related revenue loss up to an aggregate maximum of $10 million, with no more than $5 million "per physical location of the eligible entity."  *Id.* § 9009c(c)(4).  The covered period for pandemic-

3

**Appx3**

related losses spanned February 15, 2020, through March 11, 2023. *Id.* § 9009c(a)(3); (ECF 1 at ¶ 27(a)).

To fund the RRF, Congress provided that "[i]n addition to amounts otherwise available, there is appropriated to the Restaurant Revitalization Fund for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $28,600,000,000, to remain available until expended." 15 U.S.C. § 9009c(b)(2)(A). This $28.6 billion was further subdivided into two pots of money. First, $5 billion was reserved for "eligible entities with gross receipts during 2019 of not more than $500,000." *Id.* § 9009c(b)(2)(B)(i)(I). Second, $23.6 billion "shall be available to the Administrator to award grants under subsection (c) in an equitable manner to eligible entities of different sizes based on annual gross receipts." *Id.* § 9009c(b)(2)(B)(i)(II). For this larger pot of money, the Administrator was authorized to "make adjustments as necessary to the distribution of [these] funds . . . based on demand and the relative local costs in the markets in which eligible entities operate." *Id.* § 9009c(b)(2)(B)(ii).

This division into two separate pots of money lasted for "60 days after March 11, 2021," that is until May 10, 2021, "or another period of time determined by the Administrator," after which "the Administrator may make grants using amounts appropriated under subparagraph (A) to any eligible entity regardless of the annual gross receipts of the eligible entity." *Id.* § 9009c(b)(2)(C). The plaintiffs have pleaded "[o]n information and belief," that the Administrator did not extend this timeframe past May 10, 2021, meaning that any unobligated funds were freely available for award to any eligible entity after that date. (ECF 1 at ¶ 28(c).)

Section 9009c limited how eligible entities could use the grants funds they received, but these limits were minimal. Grant awardees could "use the grant funds for the following expenses incurred as a direct result of, or during, the COVID-19 pandemic," including: "[p]ayroll costs," mortgage payments, "[r]ent payments" (except for prepayment of rent), "[u]tilities," "[m]aintenance expenses," "[s]upplies," normal "[f]ood and beverage expenses," "[c]overed supplier costs," "[o]perational expenses," "[p]aid sick leave," and "[a]ny other expenses that the Administrator determines to be essential to maintaining the eligible entity." 15 U.S.C. § 9009c(c)(5).

Any eligible entity that "receive[d] a grant" and "fail[ed] to use all grant funds or permanently cease[d] operations on or before the last day of the covered period," was required to "return to the Treasury any funds that the eligible entity did not use for the allowable expenses . . . ." *Id.* § 9009c(c)(6). Because the covered period ran through March 11, 2023, any unused grant awards as of March 12, 2023, had to be returned to the Treasury.

To receive an award, eligible entities had to submit applications to the SBA certifying their need for the grant money and that they had not already received a grant under the Shuttered Venue Operators Grant program, 15 U.S.C. § 9009a. *Id.* § 9009c(c)(2)(A)(ii).

All applications were subjected to a two-step review process by the SBA. This process included a tax verification and then either an automatic or manual SBA review, including resolution of any issues or discrepancies. (ECF 1 at ¶ 44.) A manual review could take 10 to 14 days or longer, while an automatic review took "no more than approximately 48 hours." (*Id.*

4

**Appx4**

¶ 46(a)-(b).) "The review process did not include any mechanism for reserving funds for applications in the order they were received. It also did not include a check before awarding a grant to determine the order in which the application under consideration was received." (*Id.* ¶ 46(c).)

The SBA processed applications in three different sets: first a trial set, second the set of applicants prioritized by the statute, and, finally, all other applicants.

The trial group was processed "[b]etween April 25, 2021[,] and May 2, 2021." (*Id.* ¶ 53.) The trial group consisted of "approximately 2,600 potential applicants randomly selected from existing [Paycheck Protection Program] participants in the restaurant industry [who] were permitted to submit applications through the online portal to test its operation." (*Id.*)

After the trial set, on May 3, 2021, the SBA began accepting applications through an online portal, a telephone call center, and five electronic systems. (*Id.* ¶¶ 29(b), 37-39.) As of that day, the SBA accepted applications from applicants in both priority and non-priority groups. (*Id.* ¶¶ 4, 51(a) (The "SBA repeatedly encouraged businesses to submit applications on May 3, 2021, when the online portal opened."), 54.)

Regarding the priority applicants, section 9009c established a 21-day window in which applications from women-owned, veteran-owned, and socially and economically disadvantaged small business concerns received priority consideration. 15 U.S.C. § 9009c(c)(3)(A).[2] That 21-day period ran from May 3, 2021, to May 23, 2021. (ECF 1 at ¶ 29(b)). After May 11, 2021, the Administrator was permitted, but not required, to "make grants using amounts appropriated under subparagraph (A) to any eligible entity regardless of the annual gross receipts of the eligible entity." 15 U.S.C. § 9009c(b)(2)(C); (*see also* ECF 1 at ¶¶ 28(c), 49(d), 55.)[3]

As for all other applicants, the SBA did not begin processing their applications on May 24, 2021, the first day after the end of the priority period. Instead, the "SBA has represented" that on May 25, 2021, two days after the expiration of the priority application period, it "began

---

[2] On May 27, 2021, the Sixth Circuit issued a preliminary injunction ordering the SBA to fund an applicant's "grant application, if approved, before all later-filed applications, without regard to processing time or the applicants' race or sex." *Vitolo v. Guzman*, 999 F.3d 353, 365 (6th Cir. 2021). In so doing, the Sixth Circuit held that, except for the preference for veteran-owned applicants, the priority provisions likely violated the equal protection component of the due process clause to the extent they prioritized grant award to businesses based on the sex or race of their owners. *Id.* at 360-66.

[3] After the priority period ended on May 23, 2021, the "SBA decided . . . it would cease processing applications received from [p]riority [a]pplicants, process only non-priority applications SBA had received, award grants only to non-priority applicants, use remaining RRF funding only for grants awarded to non-priority applicants, and disburse no further awards to [p]riority [a]pplicants." (ECF 1 at ¶ 59.)

5

processing non-priority applications with FY 2019 gross revenues less than $500,000 . . . ."
(ECF 1 at ¶ 62.)  It was not until May 27, 2021, that the SBA finished making awards to priority
applicants and began processing and making awards to other non-priority applications.  (*Id.*
¶¶ 62, 64, 65).  Notably, on May 24, 2021, the SBA stopped accepting RRF applications due to
"overwhelming demand."  *Kingsley Restaurants, Inc. v. United States Small Bus. Admin.*, No.
1:21-CV-2314-SCJ, 2021 WL 8441778, at *1 (N.D. Ga. Aug. 24, 2021).[4]  "[C]laims on the RRF
rapidly dwarfed the allocation of funds set aside by Congress."  *Id.*

When making awards, section 9009c required that, except for the priority applicants
during the 21-day priority period and the division of the RRF into the two pots of money based
on gross revenues through May 10, 2021, "the Administrator shall award grants to eligible
entities in the order in which applications are received by the Administrator."  15 U.S.C.
§ 9009c(c)(1).  The plaintiffs allege that despite this express requirement, the SBA decided to
issue awards in the order in which applications were processed, not the order in which they were
received.  (ECF 1 at ¶ 8.)  Even though the plaintiffs' well-pleaded allegations are taken to be
true in resolving a motion to dismiss, the defendant notably has not denied that the SBA
proceeded in the manner alleged by the plaintiffs.

The plaintiffs each submitted its application to the SBA for RRF grant awards on May 3,
2021.  (*Id.* ¶ 13.)  Despite applying on the first possible day, none of the plaintiffs was ever
awarded a grant from the RRF, even though other non-priority applicants that filed their
applications later received grants.  (*See id.* ¶¶ 5, 9, 138.)  The plaintiffs contend that they should
have been awarded grants but were not because the SBA unlawfully did not award grants in the
order that applications were received.  (*Id.* ¶¶ 5, 75.)  Instead, the "SBA awarded RRF grants in
the order applications were processed.  Because the time required to process applications varied
greatly, the order in which SBA awarded grants differed significantly from the order in which
applications were received."  (*Id.* ¶ 47.)  While the SBA awarded grants in the order in which
applications were processed (*id.* ¶ 8), and although the complaint notes the SBA "*claims* to have
initiated processing of applications in the order they were received" (*id.* ¶ 54(b) (emphasis
added)), it is nevertheless unclear from the complaint and the parties' briefs how and in what
order the SBA decided to process the non-priority applications.

On or about June 30, 2021, the SBA stopped processing RRF applications.  (*Id.* ¶ 67.)
By that point, the SBA had awarded approximately $28 billion in RRF grants.  (*Id.* ¶ 75.)  In
"June 2022, approximately $180 million of RRF funding remained without recorded obligations,
including $24 million set aside for litigation."  (*Id.* ¶ 68.)  "After November 2022, SBA awarded
approximately $83 million in additional grants to businesses whose applications had been fully
processed as of June 30, 2021."  (*Id.* ¶ 69.)  These funds were at least partially "from recoveries
of misallocated grants or return of unused grants."  (*Id.*)  This set of RRF grant awards was
allegedly issued in the order in which the applications had been received, after the Department of

---

[4] Although the date the SBA stopped accepting applications is not noted in the complaint, the
plaintiffs tacitly agree with the defendant that no new applications were accepted after May 24,
2021.  (*See* ECF 8 at 40 (citing ECF 7 at 2 n.3).)

Justice advised the SBA on "how to comply with statutory requirements and court rulings." (*Id.* ¶ 69(a)-(b).)

On June 3, 2023, the Fiscal Responsibility Act, Pub. L. 118-5, 137 Stat. 10, became law. Division B, Title I, Section 52 of that act provided that "[t]he unobligated balances of amounts made available by section 5003(b)(2)(A) of Public Law 117-2," that is 15 U.S.C. § 9009c(b)(2)(A), "are hereby permanently rescinded." Notwithstanding this law, the plaintiffs allege "[o]n information and belief, available RRF funding will increase in fiscal year 2024 as a result of SBA's mandatory required audit and recovery efforts that will be ongoing through at least July 2024." (ECF 1 at ¶ 70.)

### B.     Procedural History

On October 25, 2023, the plaintiffs filed their complaint. (ECF 1.) On February 26, 2024, the defendant moved to dismiss pursuant to RCFC 12(b)(1). (ECF 7.) The plaintiffs responded on March 25, 2024 (ECF 8), and the defendant replied on April 22, 2024 (ECF 10). Oral argument was heard on May 22, 2024. During oral argument, the Court raised the question of whether 15 U.S.C. § 9009c(b)(2)(A) included a cap on the defendant's liability that may preclude the plaintiffs from stating a claim. The Court ordered supplemental briefing to address this issue. (ECF 13.) Each side filed its supplemental brief on June 5, 2024. (ECF 16-17.)

## II.     JURISDICTION AND STANDARDS OF REVIEW

The Tucker Act, 28 U.S.C. § 1491(a), vests in the Court of Federal Claims jurisdiction over claims for money damages against the United States:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

The Tucker Act itself does not "create[ ] a substantive right enforceable against the Government by a claim for money damages." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003). To bring a claim within the Court of Federal Claim's limited jurisdiction, a plaintiff must allege a violation of a statutory, regulatory, or constitutional provision which is money-mandating, meaning the provision "'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *United States v. Testan*, 424 U.S. 392, 400 (1976) (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1009 (Ct. Cl. 1967)).

The defendant has moved to dismiss the complaint for lack of subject-matter jurisdiction under RCFC 12(b)(1). In considering a motion under RCFC 12(b)(1), a "court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed.

Cir. 2011). When a plaintiff's asserted jurisdictional facts are disputed, however, only the plaintiff's uncontroverted factual allegations are accepted as true. *Shoshone Indian Tribe of Wind River Rsrv., Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012). A court is not "'restricted to the face of the pleadings'" in resolving disputed jurisdictional facts and may review evidence outside the pleadings. *Id.* (quoting *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993), *cert. denied*, 512 U.S. 1235 (1994)). Accordingly, a court may consider in resolving a motion to dismiss for lack of jurisdiction information provided by the defendant contrary to the allegations in the complaint.

The plaintiffs have the burden of establishing jurisdiction by a preponderance of the evidence. *Trusted Integration, Inc*, 659 F.3d at 1163. If a court finds that the plaintiffs have not met their burden to establish subject-matter jurisdiction over a claim, RCFC 12(h)(3) requires dismissal of that claim.

As permitted by Federal Circuit precedent, the Court *sua sponte* raised the question of whether the plaintiffs' complaint must be dismissed for failure to state a claim under RCFC 12(b)(6). *See Anaheim Gardens v. United States*, 444 F.3d 1309, 1315 (Fed. Cir. 2006) ("The trial court may dismiss sua sponte under Rule 12(b)(6), provided that the pleadings sufficiently evince a basis for that action."). Dismissal for failure to state a claim upon which relief can be granted "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). In considering dismissal under RCFC 12(b)(6), a court must both accept as true a complaint's well-pleaded factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and draw all reasonable inferences in favor of the non-moving party. *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). To avoid dismissal, a complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing that the plaintiffs are entitled to the relief sought. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

## III. DISCUSSION

### A. The Parties' Arguments

The defendant raises four arguments in its motion to dismiss for lack of subject-matter jurisdiction.

First, it argues the plaintiffs lack standing because their claims are not redressable. Specifically, the defendant argues that because the amount of funding set by Congress has been expended, no money remains in the RRF to pay for any grants; the plaintiffs' injuries, if any, therefore cannot be redressed. (ECF 7 at 14-16.)

Second, the defendant argues that the plaintiffs' claims are moot for two reasons: (1) the covered period for RRF grants has expired, meaning any unused grants would have to be returned to the Treasury as required by section 9009c(c)(6); and (2) Section 52 of Division B,

Title I of the Fiscal Responsibility Act "permanently rescinded" any "unobligated balances of amounts made available by section [9009c](b)(2)(A)." (*Id.* at 16-19.)

Third, the defendant contends that section 9009c is not money-mandating because it does not require awarding a grant to any applicant. (*Id.* at 19-22.) The defendant argues that section 9009c(c)(1) does not confer a substantive right to money because it "only speaks to the method of application administration and processing of award disbursements." (*Id.* at 20.) As for section 9009c(b)(3), while it requires the money to be used by the administrator, it is not money-mandating because it does not require payment to any specific applicant. (*Id.* at 21-22.)

Finally, the defendant argues that the complaint's references to arbitrary and capricious acts and omissions and negligence are attempts to bring claims under the APA over which the Court of Federal Claims lacks jurisdiction. (*Id.* at 22-24, 28-29.) Further, the defendant argues that the substance of the plaintiffs' "allegations in essence is an APA claim challenging SBA's decisions in administering the RRF program," notwithstanding their claim for money damages. (*Id.* at 24-27.)

The plaintiffs, naturally, disagree. They contend that they have standing because they are not seeking equitable relief that would order the SBA to award a grant, but rather money damages for the SBA's failure to award grants in compliance with the law that established the RRF. (ECF 8 at 21-23.) The availability of funds, the plaintiffs argue, is a question for the merits, not a jurisdictional defect, because the Judgment Fund can be used to pay any award for monetary damages. (*Id.* at 23 n.13, 23-27.)

Next, the plaintiffs argue their claims are not moot because section 9009c(c)(5) allows them to use any grant money received to offset already incurred expenses that predate the receipt of funds. Specifically, the plaintiffs point to the fact that the term "covered period" under section 9009c(c)(5) allows grant awards to be used for expenses that were incurred as early as February 15, 2020, well before any awards were made. (*Id.* at 27-29.) As to whether section 9009c is money-mandating, the plaintiffs argue that 9009c(c)(1) required payment of grants to them specifically because of the timeliness of their applications. (*Id.* at 18-21.) According to the plaintiffs, the SBA lacked discretion to decide whether to award a grant based on finding an applicant was qualified but had to award a grant to any qualified applicant in the order in which the application was received. (*Id.* at 12-21.)

Lastly, the plaintiffs contend that the court has jurisdiction to review whether an agency followed statutes and regulations and that the possibility of an overlap between the APA and the Tucker Act does not divest the court of jurisdiction. (*Id.* at 34-39.) The plaintiffs further emphasize how their claims for money damages more closely resemble the money damages claims in *Maine Community Health Options v. United States*, 590 U.S. 296 (2020), than the claim for injunctive relief in *Bowen v. Massachusetts*, 487 U.S. 879 (1988), and thus fall within the jurisdiction of the Court of Federal Claims under the Tucker Act, not the district courts under the APA. (*Id.* at 39-42.) The plaintiffs notably disclaim any attempt to bring APA claims and instead explain that references in the complaint to negligence or arbitrary and capricious actions are simply a "characterization of agency action," not a basis for relief. (*Id.* at 36, 39.)

9

**B.      Rule 12(b)(1)**

**1.      The Scope of the Plaintiffs' Claims**

**a.      The Tucker Act vs. the APA**

The complaint's singular cause of action is explicitly limited to a claim for money damages under the Tucker Act.  (ECF 1 at 45.)  The defendant, however, argues the court entirely lacks jurisdiction over the complaint because in substance the plaintiffs plead a claim under the APA for the SBA's illegal conduct in administering the RRF and its negligence.  Such claims, the defendant asserts, fall within the jurisdiction of the district courts.

In advancing these arguments, the defendant relies heavily on *Bowen* and the Federal Circuit's opinion in *Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994) while attempting to distinguish the present case from *Maine Community Health*.  (ECF 7 at 34, 38-41.)

A court's "jurisdiction cannot be circumvented by [ ] artful pleading and, accordingly, [courts] customarily look to the substance of the pleadings rather than their form."  *Brazos Elec. Power Co-op., Inc. v. United States*, 144 F.3d 784, 787 (Fed. Cir. 1998).  "Regardless of the characterization of the case ascribed by [a plaintiff] in its complaint, [courts] look to the true nature of the action in determining the existence or not of jurisdiction." *Katz*, 16 F.3d at 1207 (Fed. Cir. 1994).

When examining whether a claim falls under the APA or the Tucker Act, the Federal Circuit has instructed that "[t]he analysis begins [ ] with the question raised by 5 U.S.C. § 704— is there an 'adequate remedy' in a court other than the district court, that is, can the Court of Federal Claims provide an adequate remedy under the Tucker Act for the alleged wrong." *Suburban Mortg. Assocs., Inc. v. United States*, 480 F.3d 1116, 1125 (Fed. Cir. 2007).  As the Federal Circuit explained, "[i]f the jurisdictional requirements of the Tucker Act are satisfied . . . and if the Court of Federal Claims through a money judgment can provide an adequate remedy under the Tucker Act, § 704 bars the district court from hearing the case because it belongs in another court—the Court of Federal Claims." *Id.* at 1125-26 (cleaned up).

There is no question that the payment of money damages to the plaintiffs, if available, "would provide them with a complete and adequate remedy for the relief currently sought." *ARRA Energy Co. I v. United States*, 97 Fed. Cl. 12, 24 (2011) (citing *Suburban Mortg.*, 480 F.3d at 1126 and noting that when adequate remedies are available under the Tucker Act, "the district courts lack jurisdiction under section 704 of the APA"); *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1349-50 (Fed. Cir. 2005) (cleaned up) ("The availability of an action for money damages under the Tucker Act or Little Tucker Act is presumptively an 'adequate remedy' for § 704 purposes.  Because [the plaintiff] can bring an action under the Tucker Act or Little Tucker Act to redress the allegedly improper exaction, there is no waiver of sovereign immunity under the APA.").

The plaintiffs here seek only money damages (ECF 1 at 46); such damages would adequately compensate them for the allegedly illegal failure of the SBA to award the plaintiffs

the grants, *i.e.*, money, which they applied for and were entitled to but did not receive.  The plaintiffs are not seeking prospective relief.  Similarly, there is no request that would entangle the court in a "complex ongoing relationship" necessitating adjudication of future disputes.  *Maine Cmty. Health*, 590 U.S. at 327.  These factors suggest that the plaintiffs' claims fall more neatly under the Tucker Act than they do under the APA.

Also relevant to the analysis is the fact that relief has not been available under the APA to claimants seeking RRF grants.  Multiple district courts have found that equitable relief is unavailable because the RRF has been depleted, and that claims under the APA are therefore moot.  *Reboot Macon, LLC, v. United States*, 5:21-CV-221, 2023 WL 4672395, at *3-5 (M.D. Ga. July 20, 2023); *Collins v. Small Business Admin.*, No. 2:22-CV-4104, 2024 WL 128201, at *3-4 (E.D. Pa. Jan. 11, 2024); *W6 Restaurant Group, Ltd, v. Guzman*, No. 1:21-CV-2361, 2024 WL 1973132, at *6-10 (N.D. Ohio May 3, 2024).  In the absence of available APA remedies, not only does the Tucker Act provide an "adequate remedy," but likely the only remedy for the plaintiffs' claims.

The defendant attempts to shoehorn the plaintiffs' claims into the *Bowen* framework to argue they must be raised under the APA.  The plaintiff in *Bowen* sought "to review a final order of the Secretary of Health and Human Services refusing to reimburse a State for a category of expenditures under its Medicaid program."  487 U.S. at 882.  The Supreme Court held that a:

> suit to enforce § 1396b(a) of the Medicaid Act, which provides that the Secretary "shall pay" certain amounts for appropriate Medicaid services, is not a suit seeking money in compensation for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money.

*Id.* at 900.[5]

---

[5] The Supreme Court hinted that its holding in *Bowen* was not broad, noting in a footnote immediately after the language quoted in the text that "[t]here are, of course, many statutory actions over which the Claims Court has jurisdiction that enforce a statutory mandate for the payment of money rather than obtain compensation for the Government's failure to so pay.  The jurisdiction of the Claims Court, however, is not expressly limited to actions for 'money damages,' whereas that term does define the limits of the exception to § 702.  Moreover, such statutes, unlike a complex scheme such as the Medicaid Act that governs a set of intricate, ongoing relationships between the States and the Federal Government, are all statutes that provide compensation for specific instances of past injuries or labors; suits brought under these statutes do not require the type of injunctive and declaratory powers that the district courts can bring to bear in suits under the Medicaid Act.  Thus, to the extent that suits to enforce these statutes can be considered suits for specific relief, suits under the Tucker Act in the Claims Court

11

The Supreme Court's holding in *Bowen* has been narrowly interpreted by the Federal Circuit. In *Consolidated Edison Company of New York v. U.S. Department of Energy*, the Federal Circuit explained that "[i]n *Bowen*, the Supreme Court linked its judgment to a specific set of circumstances," that were "not present in [*Consolidated Edison*]." 247 F.3d 1378, 1384, *cert. denied*, 534 U.S. 1034 (2001). In *Suburban Mortgage,* the Federal Circuit expounded on the appropriate and limited application of *Bowen* by focusing on the distinctive circumstances present in that case:

> These circumstances include: Bowen was a dispute between two sovereigns—a state government and the federal government—implicating federalism issues; the dispute centered on the administration of a major federal grant, the Medicaid program, involving enormous sums of money and complex interactions between the governments and the beneficiaries; at issue were the institutional arrangements between these two governments; the governments were locked into a fabric of long-term administration of the program; and the money involved in the uncovered education services was a small fraction of the total reimbursement the state received each year for its Medicaid costs under the program. In addition, the Court's focus was on the statutory requirements set forth in this complex grant program—nowhere in *Bowen* did the Court make reference to the existence of any specific contract or express agreement defining the relationship between the parties.

*Suburban Mortg.*, 480 F.3d at 1127. These distinctive factors of *Bowen* were absent from *Consolidated Edison* and *Suburban Mortgage*; they are also absent from this case.

The effort to limit *Bowen* to the nature of the underlying statutory regime at issue and the remedy sought was reinforced in *Suburban Mortgage*, in which the Federal Circuit identified as the key feature of *Bowen* the fact that it involved "a complex, ongoing relationship between plaintiff and the Government in which the plaintiff seeks declaratory or injunctive relief to modify the Government's *future* obligations under the program." *Suburban Mortgage*, 480 F.3d at 1127 (emphasis in original).

Because of these absent features, in *Suburban Mortgage*, unlike in *Bowen*, "a judgment ordering prospective relief w[as] not [ ] necessary or appropriate". *Id.* Thus, jurisdiction in *Suburban Mortgage* was found to be appropriate in the Court of Federal Claims, not the district court. As now-Judge Solomson observed in analyzing these precedents in his book on the jurisdiction and procedure of the Court of Federal Claims, "[t]he bottom line is that, if a plaintiff's goal is to obtain a money judgment and the claim does not sound in tort, the [Court of Federal Claims] should be considered as the putatively correct forum for the claim in the first

_____

offer precisely the sort of 'special and adequate review procedures' that § 704 requires to direct litigation away from the district courts." *Bowen*, 487 U.S. at 900 n.31 (cleaned up).

**Appx12**

instance." Matthew H. Solomson, Court of Federal Claims Jurisdiction, Practice, and Procedure, 29.IV.A. (2016).

Most importantly, the Supreme Court appears to have agreed with the Federal Circuit when it clarified how to apply *Bowen* in *Maine Community Health.* In *Maine Community Health*, its most recent exposition on the Tucker Act, the Supreme Court appeared to accept the Federal Circuit's approach by pointing to two grounds on which to distinguish *Bowen*.

First, the Court noted that the nature of relief sought in *Bowen* was not money damages but instead "prospective declaratory and injunctive relief to clarify the extent of the Government's ongoing obligations under the Medicaid program." *Maine Cmty. Health*, 590 U.S. at 326-27. Similarly, the plaintiffs here are seeking "past due sums," *see id.*, and not injunctive, declaratory, or other prospective relief. (ECF 1 at ¶ 153 (specifying plaintiffs have "incur[red] monetary damages in the amount of their RRF grants"); ECF 1-2.)

Second, the Supreme Court emphasized the importance of the relationship between the parties. According to the Supreme Court, "the Administrative Procedure Act 'is tailored' to '[m]anaging the relationships between States and the Federal Government that occur over time and that involve constantly shifting balance sheets,' while the Tucker Act is suited to 'remedy[ing] particular categories of past injuries or labors for which various federal statutes provide compensation.'" *Maine Cmty. Health*, 590 U.S. at 326-27 (quoting *Bowen*, 487 U.S. at 904-05 n.39). The plaintiffs' claims are for a one-time grant award. They would not require any ongoing or prospective relationship with the SBA regarding the RRF; the plaintiffs are seeking only a one-time payment of damages for grants that they contend they are owed but did not receive, contrary to the express requirements imposed on the SBA by Congress.

As refined and clarified by ensuing precedents from both the Supreme Court and the Federal Circuit, *Bowen* does not support the defendant's argument that the plaintiffs' claims are beyond the jurisdiction of the Court of Federal Claims under the Tucker Act.

The defendant's reliance on *Katz v. Cisneros* is also misplaced. That case involved a challenge by a plaintiff to a federal agency's interpretation of its regulations related to federal housing-support payments to local housing agencies. *Katz* did not involve a claim under a direct statutory obligation between the plaintiff and a federal agency; rather, it involved a challenge to an agency's regulations that happened to have financial consequences for the plaintiff. 16 F.3d at 1205-06; *see also Brighton Vill. Assocs. v. United States*, 52 F.3d 1056, 1059-60 (Fed. Cir. 1995) (relying on the fact that the plaintiff in *Katz* was not in privity with the federal government, but rather sought to challenge an interpretation of federal regulations that would indirectly and prospectively provide money to the plaintiff by changing how a federal agency calculated future contract rents under a contract between the plaintiff and a local housing agency); *Boaz Hous. Auth. v. United States*, 141 Fed. Cl. 74, 81 (2018) (same), *aff'd*, 994 F.3d 1359 (Fed. Cir. 2021). The Federal Circuit held that the claim in *Katz* was properly heard in district court under the APA because the plaintiff was seeking prospective relief through an interpretation of a federal regulation. *Katz*, 16 F.3d at 1208-1209. In contrast, the plaintiffs in the present case request retrospective damages resulting from the SBA's denial of a one-time

13

**Appx13**

payment of money directly from the federal government under a grant program administered by the SBA.  The relief sought by the plaintiffs does not require any prospective relief.

While the plaintiffs' claim involves a challenge to the SBA's past administration of the RRF, this fact on its own does not convert the plaintiffs' claim for damages into an APA claim.  "The fact that the Claims Court ha[s] to interpret the meaning of [a] regulation does not convert [the plaintiffs' claim] into an APA claim.  The Claims Court can resolve issues, including interpreting a government regulation."  *Portland Mint v. United States*, 102 F.4th 1371, 1381 n.6 (Fed. Cir. 2024) (citing *Radium Mines Inc. v. United States*, 153 F. Supp. 403, 405-06 (Ct. Cl. 1957)) (interpreting the word "redemption" in regulations governing the redemption of bent or partial coins by the U.S. Mint).  This recent holding by the Federal Circuit in *Portland Mint* is consistent with its long-standing jurisprudence.  "'It is often necessary to interpret or apply statutory or common law principles in order to resolve contract claims, but the fact that the resolution of a contract claim may turn on the interpretation of a statute does not deprive the Court of Federal Claims of jurisdiction over that claim.'"  *Holmes v. United States*, 657 F.3d 1303, 1312 (Fed. Cir. 2011) (quoting *Del–Rio Drilling Programs Inc. v. United States*, 146 F.3d 1358, 1367 (Fed. Cir. 1998)).

The fact that the plaintiffs' claims are based directly on an alleged violation of a statutory command rather than the interpretation of a contract does not *ipso facto* place the claims under the APA and outside the Tucker Act.  Indeed*, Maine Community Health* addressed the effect of a limitation in an appropriations rider that sought to limit the obligations authorized in the underlying statutory scheme, a case of statutory interpretation.  590 U.S. at 314-21.  *Bowen* and its progeny provide the test for determining whether a claim falls under the APA, for the district courts to resolve, or under the Tucker Act, for this court to resolve.  Whether the underlying legal issue involves the interpretation of a statute, regulation, contract, or other legal instrument is not determinative to the outcome of that test.

Judges of this court routinely review the way federal agencies administer and apply statutes and regulations in a wide variety of contexts.  The court often considers under the Tucker Act claims over which district courts may have concurrent jurisdiction.  *See Quality Tooling, Inc. v. United States*, 47 F.3d 1569, 1573 (Fed. Cir. 1995) ("There can be little doubt that, by statute, both the District Court, sitting in bankruptcy, and the Court of Federal Claims are empowered with subject matter jurisdiction over this contract dispute."); *Qwest Corp. v. United States*, 48 Fed. Cl. 672, 686 (2001) ("There is nothing irreconcilable between the statutes in permitting [a plaintiff] to seek 'just compensation' in the Court of Federal Claims under the Tucker Act for an alleged taking . . . even though [a plaintiff] may seek the same relief in a federal district court under the Telecom Act.").

This case is simply an instance of concurrent jurisdiction, which the Court of Federal Claims already has with the district courts in several legal areas, such as claims for tax refunds, 28 U.S.C. § 1346(a)(1), and claims seeking less than $10,000, 28 U.S.C. § 1346(a)(2).  This concurrent jurisdiction can also include claims that involve questions of statutory interpretation.  *See Broughton Lumber Co. v. Yeutter*, 939 F.2d 1547, 1551 & n. 2 (Fed. Cir. 1991) ("agree[ing] with th[e] principle" "that district court jurisdiction can be concurrent with that of the Claims Court," particularly in suits under the APA or "involve[ing] statutes with language permitting a

14

**Appx14**

party to 'sue and be sued' in district court."); *Brit. Airways PLC v. United States*, 170 Fed. Cl. 305, 311 (2024) (noting "[i]t is well established that this jurisdictional grant extends to suits for the refund of taxes remitted to the Treasury"; such suits often involve interpreting the Internal Revenue Code) (citing 28 U.S.C. § 1346(a)); *Prochazka v. United States*, 116 Fed. Cl. 444, 451-57 (2014) (in the context of an Equal Access to Justice Act fee petition, evaluating whether the defendant's interpretation of a statute was substantially justified in part by looking to a district court's opinion addressing the same "general issue raised in this case").  Further, the Federal Circuit, without suggesting that such a challenge was properly raised only under the APA, has specifically considered whether the government's interpretation of a term in a grant-authorizing statute was correct.  *Star-Glo Assocs., LP v. United States*, 414 F.3d 1349, 1356-58 (Fed. Cir. 2005) (addressing the meaning of "trees per acre" in Pub. L. No. 106-387, § 810(a)).

The plaintiffs are seeking a one-time payment of a specific amount of money they contend is due to them and are not seeking prospective relief nor are in an ongoing, long-term relationship with the federal government.  Their claim properly falls under the Tucker Act and not the APA, provided that 15 U.S.C. § 9009c is money-mandating.

### b.    The Plaintiffs' Inartful Complaint

Before addressing whether section 9009c is money-mandating, the plaintiffs' complaint must be addressed.  On its face, the complaint is explicitly limited to a claim for money-damages under section 9009c.  (ECF 1 at ¶ 14, pg. 41, 45-46.)  Nevertheless, the complaint repeatedly alleges negligent and arbitrary or capricious conduct by the SBA.  (*Id.* ¶¶ 80-143.)  These references have, fairly, led the defendant to question whether the plaintiffs are attempting to raise an APA claim or, even further afield, a claim for negligence.

It is well-established that the court does not possess jurisdiction over negligence claims, which sound in tort and are expressly excluded from Tucker Act jurisdiction, 28 U.S.C. § 1491(a); *Keene Corp. v. United States*, 508 U.S. 200, 214 (1993) ("[T]ort cases are outside the jurisdiction of the Court of Federal Claims today . . . .").  Likewise, claims under the APA are beyond the jurisdiction of the Court of Federal Claims.  *Martinez v. United States*, 333 F.3d 1295, 1313 (Fed. Cir. 2003) ("[T]he Court of Federal Claims lacks APA jurisdiction . . . .").  The plaintiffs do not dispute this settled law.  Instead, they assert that they only intended their complaint to characterize the defendant's actions, rather than raise additional claims.  (ECF 8 at 36, 39.)

The complaint is inartful, containing much superfluous and useless rhetoric to add atmospherics to the claim.  Not only does this surplusage needlessly put at risk the jurisdictional basis for the plaintiffs' claims, but it is ineffective.

To the extent the plaintiffs' complaint simply includes a "characterization of agency action," however, that characterization is not relevant to the court's jurisdiction.  *See Brazos*, 144 F.3d at 787; *Katz*, 16 F.3d at 1207.  "Of course, the party who brings a suit is master to decide what law he will rely upon . . . ." *The Fair v. Kohler Die & Specialty Co*., 228 U.S. 22, 25 (1913).  The complaint should not have included references to negligence or arbitrary conduct by the SBA, but it does not explicitly state a cause of action under the APA or a negligence

15

theory and does not claim to rely on the APA or another basis for asserting this court's jurisdiction. (ECF 1 at ¶ 14, pg. 41, 45-46.) In short, the plaintiffs are arguing that the SBA did not have discretion to refuse to make grant awards to them under the statute, and the arbitrary exercise of discretion that the SBA did not have does not affect the legal issue raised by the plaintiffs.

The gravamen of the plaintiffs' complaint is that the defendant violated a money-mandating statute within this court's Tucker Act jurisdiction, and not whether the defendant committed a tort or violated the APA. *Cf. Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) ("The [well-pleaded complaint] rule makes the plaintiff the master of the claim; he or she may avoid" raising claims they do not wish to raise.). If on the merits the plaintiffs attempt to argue they may recover based on the SBA's negligent or arbitrary conduct without connecting it to a violation of a money-mandating statute, the defendant can object to such claims as falling outside the scope of the plaintiffs' complaint and the court's jurisdiction.

## 2. Whether Section 9009c is Money-Mandating

The plaintiffs' claims are properly heard under the Tucker Act because they seek monetary relief rather than prospective relief under the APA and do not sound in tort. The question remains whether section 9009c is money-mandating such as to allow the plaintiffs the monetary relief they seek. The two relevant provisions are: (1) subsection (b)(3)'s requirement that "[t]he Administrator shall use amounts in the Fund to make grants described in subsection (c)," and (2) subsection (c)(1)'s requirement that "[e]xcept as provided in subsection (b) and paragraph (3), the Administrator shall award grants to eligible entities in the order in which applications are received by the Administrator." The plaintiffs rely on the "shall award" language of section 9009c(c)(1) to support their claim that the statute is money-mandating.

The defendant acknowledges that a statue is money-mandating "when the Government does not have any discretion to pay funds once the requirements of the statute are met." (ECF 7 at 19 (citing *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364 (Fed. Cir. 2005)).) The defendant argues, however, that "nothing in [section 9009c's] text compels SBA to pay upon receipt of a satisfactory application." (*Id.* at 21.) "If Congress had intended SBA to award grants after the priority period to all eligible entities" or some variation thereof, "it would have said so." (*Id.* at 20.) Instead, the defendant argues that the "shall award" language of section 9009c(c)(1) "only speaks to the method of application administration and processing of award disbursements." (*Id.*) The defendant also points to section 9009c(b)(3), which provides that "[t]he Administrator shall use amounts in the RRF to make grants described in subsection (c)," to argue that this provision shows Congress only *empowered* the SBA to make awards to entities that met the eligibility criteria; Congress did not require "SBA to specifically make payments to any applicant." (*Id.* at 21.)

"A statute is money mandating if either: (1) it can fairly be interpreted as mandating compensation by the Federal Government for damages sustained; or (2) it grants the claimant a right to recover damages either expressly or by implication." *Lummi Tribe of the Lummi Rsrv., Washington v. United States*, 870 F.3d 1313, 1317 (Fed. Cir. 2017) (cleaned up). "It is enough 'that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates

16

**Appx16**

a right of recovery in damages.' [*United States v. White Mountain Apache Tribe*, 537 U.S. 465, 473 (2003)]. Further, the statute and regulations must be money-mandating as to the class of which plaintiff claims to be a member." *Roberts v. United States*, 745 F.3d 1158, 1162 (Fed. Cir. 2014).

"A statute is not money-mandating when it gives the government *complete* discretion over the decision whether or not to pay an individual or group." *Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006) (emphasis added). Even statutes that appear to be discretionary can be money-mandating. An apparently discretionary statute is money-mandating "when an analysis of congressional intent or the structure and purpose of the statute reveal one of the following: (1) the statute has 'clear standards for paying' money to recipients, (2) the statute specifies 'precise amounts' to be paid, or (3) the statute compels payment once certain conditions precedent are met." *Id.* (quoting *Samish Indian Nation*, 419 F.3d at 1364-65).[6] Although this test apparently requires the "precise amounts to be paid" to be clear from the statute, the Federal Circuit has noted that a statute may be found to be money-mandating even when an agency "retains some discretion to determine the amount of an award, within prescribed limits . . . ." *Doe v. United States*, 100 F.3d 1576, 1582 (Fed. Cir. 1996) (citing *Bradley v. United States*, 870 F.2d 1578 (Fed. Cir. 1989)).

"'Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'" *Gross v. FBL Fin. Servs*., Inc., 557 U.S. 167, 175 (2009) (quoting *Engine Mfrs. Assn. v. South Coast Air Quality Management Dist*., 541 U.S. 246, 252 (2004)). "When terms used in a statute are undefined, [courts] give them their ordinary meaning." *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995). "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (cleaned up). "The plain meaning that we seek to discern is the plain meaning of the whole statute, not of isolated sentences." *Beecham v. United States*, 511 U.S. 368, 372 (1994).

Section 9009c does not provide the Administrator discretion as to whether to award a grant. Section 9009c(b)(1) establishes the RRF, with subsection (b)(2)(A) specifically appropriating $28.6 billion in funding for the RRF and authorizing the SBA to place an "amount otherwise available" into the RRF. The next provision, (b)(2)(B)(i) goes on to specify that $5 billion should be set aside for certain smaller businesses, and that the remaining $23.5 billion should be available "to award grants under subsection (c) in an equitable manner to eligible

---

[6] Notably, both *Doe* and *Samish Indian Nation* frame this test with the disjunctive "or," but a later case, *Roberts v. United States*, without explanation, frames this test with the conjunctive "and," requiring all three prongs to be met. 745 F.3d at 1163 (citing *Perri v. United*, 340 F.3d 1337, 1343 (Fed. Cir. 2003) (finding all three factors met in that case without framing them as elements of a test)). Because *Doe* and *Samish Indian Nation* both preceded *Roberts* and, unlike *Perri*, explicitly expounded a three-part disjunctive test, the Court relies on the earlier framing of the test.

17

entities of different sizes based on annual gross receipts." Subsection (b)(2)(B)(ii) allows the Administrator to "make adjustments as necessary to the distribution of funds under clause (i)(II) based on demand and the relative local costs in the markets in which eligible entities operate." Skipping over subparagraph (b)(2)(C), which deals with when the Administrator is allowed to make awards after the initial period, subsection (b) ends with paragraph (b)(3)'s unambiguous command that "[t]he Administrator shall use amounts in the Fund to make grants described in subsection (c)."

This language allows the Administrator no discretion as to the uses to which she may put the amounts in the RRF. None of provisions in subsection (b) establishing the RRF provide any discretion to the Administrator to refuse to use the money in the RRF to make a grant. At best, the references to "award[ing] grants under subsection (c) in an equitable manner" in section 9009c(b)(2)(B)(i)(II) and to "mak[ing] adjustments as necessary to the distribution of funds under clause (i)(II) based on demand and the relative local costs" in section 9009c(b)(2)(B)(ii) allow the Administrator to apportion the funds into different pots of money from which she may make award to different groups of "eligible entities of different sizes based on annual gross receipts." Notably, these provisions do not affect the amount any given applicant may receive, which is specifically governed by section 9009c(c)(4)(B). That provision species that "[e]xcept as provided *in this paragraph*," thereby excluding the provisions in subsection (b), "the amount of a grant made to an eligible entity under this subsection shall be equal to the pandemic-related revenue loss of the eligible entity." (Emphasis added). It is unclear from the complaint if the Administrator used her authority to create different pots of money, but even if she did, there is no provision that would have authorized her to deny an award to an eligible entity that fell within the size requirements for award from any specific pot of money.

Beyond restricting the uses the Administrator may make of the amounts in the RRF, the statutory language does not grant the Administrator any discretion as to how much any given applicant is to be awarded. Section 9009c(c)(4)(B)(i) requires that, subject to aggregate maximum award limits, "the amount of a grant made to an eligible entity under this subsection shall be equal to the pandemic-related revenue loss of the eligible entity," with pandemic-related revenue loss defined in section 9009c(a)(7). At best, section 9009c(a)(7) allows the Administrator to offer alternate formulas for calculating pandemic-related revenue loss in certain situations. But that does not give the Administrator the ability to reject any given application for award.

Further, section 9009c(b)(3) requires the Administrator to use the money "in the Fund to make grants described in subsection (c)," and subsection (c)(1) precisely specifies the order in which the Administrator is required to award grants: "in the order in which applications are received by the Administrator."

The provisions of subsection (c) go on to specify application requirements, priorities in awarding grants, the way grant amounts are to be determined, and the permissible uses of the grants. None of the remaining provisions, however, vests the Administrator with any discretion over whether to make an individual grant award or authorize her to make awards in the order in which applications are processed or any other order in addition to or in lieu of the order specified

18

**Appx18**

by Congress in the law.[7]  Instead, these provisions, combined with the requirements that an applicant prove a pandemic-related revenue loss under subsection(a)(7), only give the Administrator a ministerial role in implementing the RRF.

Importantly, section 9009c is not an unlimited money-mandate requiring the payment of grants to all eligible entities.  Section 9009c(b)(3) only requires the Administrator to "use amounts in the Fund to make grants described in subsection (c)."  In other words, the statute does not provide a general entitlement and is not a money-mandating grant to all eligible entities; instead, the provision requires the use of a specific fund of money to be awarded to eligible entities in a specified order until the funds are exhausted.  Once the funding runs out, applicants are out of luck.  The plaintiffs allege they fall within the order of payment specified by Congress and are entitled to payment because they filed their applications on the first day applications could be submitted, yet applicants that filed their applications later than the plaintiffs received grants and the plaintiffs did not.  (ECF 1 at ¶¶ 5, 9, 13, 138.)

Section 9009c(c)(1) requires payment of grants in the order applications are received.  By its plain terms, therefore, section 9009c(c)(1) establishes an individual right for eligible entities to receive awards based on, with limited exceptions, a first-come, first-served basis.  The congressional intent and consequence of this provision is obvious: diligent applicants would be assured an award over less diligent ones.  *See Vitolo v. Guzman*, 999 F.3d 353, 357 (6th Cir. 2021) ("The key to getting a grant is to get in the queue before the money runs out. The Small Business Administration distributes money on a first come, first served basis.").  The approach taken by Congress makes sense because Congress knew the demand would exceed the amount of funding it was providing for the RRF.

If an eligible entity filed an application right after the first $28.6 billion worth of eligible applications were submitted, it would only have itself to blame for not receiving an award.  Diligent applicants would not be subject to unpredictable administrative processing speeds; no applicant would lose out on a grant simply because the processor assigned to consider its application happened to be on vacation or home with a sick child that day.  In short, Congress wrote into the law a clear order of awardees for a grant; it specifically rejected a lottery system in which some applicants apply for a grant in one order but receive them in a totally different one outside of their control.  Congress rejected the notion that the vicissitudes and vagaries of

---

[7] At best, the Administrator had some discretion to set aside additional funding for priority applicants.  Section 9009c(c)(3)(A) provides that "[t]he Administrator may take such steps as necessary to ensure that [priority applicants] described in this subparagraph have access to grant funding under this section after the end of such 21-day period."  This provision is referring to the need to take systemic steps, such as reserving necessary sums of money, and does not otherwise authorize the Administrator to exercise discretion when reviewing specific applications.  Given the SBA stopped processing priority applications on May 23, 2021 (*see* ECF 1 at ¶ 59), and the "SBA awarded the final RRF grants to [p]riority [a]pplicants" on May 27, 2021 (*id.* ¶ 65), there is no indication that the Administrator took any such steps.

administrative or bureaucratic happenstance would influence which applicants received a grant and which did not.

Despite the clear congressional directive spelled out in the statute itself, the SBA decided to make awards in the order that it processed applications, precisely the kind of bureaucratic vagary Congress sought to avoid. The defendant offers a weak justification of the SBA's interpretation that the statute allowed it to make awards in the order that applications were processed. In support of the SBA's approach, the defendant musters two authorities in a footnote. (ECF 7 at 20 n.5.)

First, although a court must give undefined statutory terms "their ordinary meaning," *Asgrow Seed*, 513 U.S. at 187, the defendant inventively argues for a plausible but uncommon definition of the word "receive" based on a citation to a single dictionary's definition of the word "receive" as "'[t]o admit or accept (a person or thing).'" (ECF 7 at 13 n.5 quoting *Receive*, Oxford English Dictionary (3d ed. 2009) ("OED").) According to the defendant, this means that section 9009c(c)(1)'s requirement to "award grants to eligible entities in the order in which applications are received by the Administrator" only applied once the Administrator fully processed and approved an application, *i.e.*, accepted it.

The defendant's interpretation, however, is not even strongly supported by the OED. Digging further into the primary definition of receive, the OED, available online with some revisions, specifies that this usage of "receive" is often rare or obsolete. *See Receive*, OED, https://www.oed.com/dictionary/receive_v?tab=meaning_and_use#26545903 (last visited July 24, 2024). As reflected in the online edition, many of the detailed definitions under the defendant's cited headline definition are also described as being "chiefly [used] in religious contexts," "obsolete," "chiefly historical," applying only to a person, or used in combination with references to personal objects or simple predicates, such as "as," "for," "to," or "to be." *Id.*

The defendant's proffered definition must be rejected. "'It is a fundamental canon of statutory construction that words will be interpreted as taking their ordinary, contemporary, common meaning,' which may be derived from 'dictionaries from the era of the statutory provision's enactment.'" *New York & Presbyterian Hosp. v. United States*, 881 F.3d 877, 882 (Fed. Cir. 2018) (quoting *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (cleaned up)).

Contrary to the single "rare" or "obsolete" definition of "receive" relied on by the defendant, there are several other dictionaries whose primary definition of "receive" is "to come into possession of," *Receive*, Merriam-Webster, https://www.merriam-webster.com/dictionary/receive (last visited July 24, 2024); "to get or be given something," *Receive*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/receive (last visited July 24, 2024); *Receive*, The Britannica Dictionary, https://www.britannica.com/dictionary/receive first in the context (last visited July 24, 2024) (same); or "to get something that someone has given or sent to you," *Receive*, https://dictionary.cambridge.org/us/dictionary/essential-american-english/receive (last visited July 24, 2024).

20

In contrast, the defendant's asserted definition seems to be overly technical or outdated rather than the ordinary, plain meaning of the statutory term "receive." To illustrate, imagine an applicant called the SBA to inquire, "have you received my application?" It would be inconsistent with modern, common usage of the word for an SBA representative to reply "no, we're still processing it." Or, more generally, imagine if a person sent someone a letter and asked the recipient if the letter had been received. If the recipient said no, the sender would naturally think it had not yet arrived or was lost in the mail, not that the recipient left it in the mailbox and thereby did not "admit or accept" it into his home. Absent some indication from the text of section 9009c that this more arcane and less colloquial meaning of the word "receive" was intended, no person would understand the plain meaning of "receive" to mean "accept." This reading is especially applicable because section 9009c(c)(2)(B) directs the Administrator "[i]n *accepting* applications for grants under this subsection" to "prioritize the ability of each applicant to use their existing business identifiers . . . ." (Emphasis added). This language reflects that Congress intended to draw a distinction between the SBA *accepting* applications and simply *receiving* them. *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 793 (Fed. Cir. 2021) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012)) ("'A word or phrase is presumed to bear the same meaning through a text; a material variation in terms suggests a variation in meaning.'").

Most importantly, the defendant's interpretation also would effectively make section 9009c(c)(1) a nullity, as the SBA likely would have defaulted to making awards in the order in which it processed applications; a congressional directive would not have been necessary. Reading the statute as the defendant proposes would effectively nullify one of the RRF's central provisions. Such a reading is impermissible. *See United States v. Menasche*, 348 U.S. 528, 538-39 (1955) (cleaned up) ("The cardinal principle of statutory construction is to save and not to destroy. It is [a court's] duty to give effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section, as the Government's interpretation requires."); Scalia & Garner, supra, at 174-79 (the Surplusage Canon). Reading "receive" to carry its normal meaning avoids that problem.

Creating surplusage is not the only serious problem with the defendant's proposed definition of "receive." Unless the context demands otherwise, "there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433, (1932); *accord Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 319-20 (2014). The defendant's proffered definition of "receive" in the statute appears to be incompatible with at least one usage of the word "received" in section 9009c. Section 9009c(a)(7)(C)(i) provides "the expenses described in subsection (c)(5)(A) that were incurred by the eligible entity minus any gross receipts received." Businesses generally do not "accept" gross receipts, *i.e.*, money, they come into possession of or are given it. The defendant's reading of "receive" instead of the more common understanding of the term is not a good fit for the statute.

Second, the defendant relies on an out-of-context quote from *Vitolo* to support the SBA's interpretation of the statute. That case focused on the constitutionality of the priority period for women-owned and socially and economically disadvantaged small business concerns under section 9009c(c)(3). The Sixth Circuit's opinion did note that after the priority period ended,

21

"'[t]he statute now requires [SBA] to *begin processing* grant requests in the order they were received, without regard to the applicants' race or sex.'" (ECF 7 at 20 n.5 (quoting *Vitolo*, 999 F.3d at 359) (emphasis by the defendant).)  In its opinion, however, the Sixth Circuit also noted that "[t]he key to getting a grant is to get in the queue before the money runs out.  The [SBA] distributes money on a first come, first served basis."  *Vitolo*, 999 F.3d at 357.  The statement that the SBA had to process grants in the order in which the applications were received does not in any way suggest there was no statutory requirement that the SBA pay grants to applicants in the order in which applications were received; instead, the Sixth Circuit's comment complements the statutory obligation, because processing applications was a prerequisite to making a grant award.

Finally, the defendant argues the SBA had to make grant awards in the order applications were processed because otherwise "no money could be disbursed until the first-filed application was processed to approval."  (ECF 7 at 20 n.5.)  This defense, however, presents a policy argument that at best attempts to argue the absurdity of following section 9009c(c)(1)'s language literally.

Even accepting the argument that Congress could not have intended that each applicant literally had to wait until each earlier applicant received a grant, that would only suggest the SBA could have examined the amount sought by each application in the order received until the amounts sought totaled $28.6 billion.  Then once an application in that group was denied, it could start processing the next application in line from outside that group.  The SBA then could have made awards on later-filed applications, provided it had reserved amounts claimed by earlier-filed applicants until those applications were either paid out or denied as ineligible.  The plaintiffs allege that the SBA has previously adopted this course in other grant programs, suggesting this approach was administratively feasible.  (ECF 1 at ¶ 79(b).)  This process would have ensured no earlier applicant was harmed by awarding a grant to a later applicant, thereby satisfying both the text and the intent of section 9009c(c)(1).

The Administrator therefore was required to use the RRF to make grants under section 9009c(b)(3), and to do so in the order specified by section 9009c(c)(1), an order that gave each eligible applicant an individual right to receive payment before any later applicant.  Because the SBA lacked discretion under section 9009c as to whether to pay money to specific applicants who meet the requirements of the statute or as to the amounts to award a specific applicant, section 9009c can fairly be read to be money-mandating.  It does not matter that section 9009c does not literally command payment to all eligible entities because of the limited funding provided to the RRF, what matters is that the plaintiffs fall within the scope of section 9009c's money-mandate.[8]  *See Fisher v. United States*, 402 F.3d 1167, 1175 (Fed. Cir. 2005) (citing

---

[8] To the extent the defendant argues the statute is not money-mandating because the Administrator did not determine the plaintiffs were eligible to receive a grant (ECF 7 at 20 ("Congress could not have intended SBA to hand out money without an eligibility determination"), that fact alone does not render the statute not money-mandating.  "The fact that

**Appx22**

*Sawyer v. United States*, 930 F.2d 1577, 1580 (Fed. Cir. 1991) and noting that the statute at issue in *Sawyer* was held to be money-mandating "because when the requirements of the statute are met . . . the [plaintiff] is entitled to compensation"); *Roberts v. United States*, 745 F.3d at 1162.

When the statutory provisions are read together, it becomes clear that section 9009c required the Administrator to award grants to all eligible applicants, the hallmark of a money-mandating statute, until the RRF was exhausted. The Court relies on the "shall use" and "shall award" language in section 9009c(b)(3) and (c)(1) to find the statute money-mandating by its plain terms. Even if this language simply authorized the Administrator to make awards, section 9009c would still be money-mandating because it would meet each of the three prongs of the test for determining if a discretionary statute is money-mandating. *See Samish Indian Nation*, 419 F.3d at 1364-65; *Doe*, 463 F.3d at 1324; *Perri v. United*, 340 F.3d 1337, 1342-43 (Fed. Cir. 2003).

Section 9009c therefore is money-mandating, but it is a limited mandate applying only to the money within the RRF because section 9009c(b)(3) only requires making awards to applicants out of the money available within the RRF. Because the plaintiffs allege sufficient facts to demonstrate they likely were eligible entities (ECF 1 at ¶¶ 128-134), a contention the defendant does not currently dispute, section 9009c is "money-mandating as to the class of which plaintiff[s] claim[ ] to be a member." *Roberts*, 745 F.3d at 1162.

### 3. Redressability and Mootness

The defendant's final jurisdictional arguments are that the plaintiffs' claims are not redressable and are moot. (ECF 7 at 14-19.) The defendant bases its redressability argument on the lack of available sums remaining in the RRF for any further awards. (*Id.* at 15-16.) The defendant also argues that because no funds remain available in the RRF and any funds awarded now from the RRF would have to be returned to the Treasury under the Fiscal Responsibility Act or section 9009c(c)(6), the plaintiffs' claims are moot. (*Id.* at 16-19.)

Redressability is one of the three irreducible constitutional requirements for standing.[9] *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998). For an injury to be

---

the statute imposes requirements for the payment of money does not mean that only claimants who have been determined by a Government official to meet those requirements have a right to the money the statute provides. It is the statute, not the Government official, that provides for the payment. If the Government official's determinations under the statute are in error," or as here were never made in the first place, "the court is there to correct the matter, and to have the proper determinations made." *Fisher*, 402 F.3d at 1175.

[9] The defendant does not contest that the plaintiffs have met the other two requirements for standing established in *Lujan v. Defenders of Wildlife*: (1) an actual, concrete, and particularized injury that is (2) fairly traceable to the defendant. *See* 504 U.S. 555, 560-61 (1992). The

**Appx23**

redressable, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992) (cleaned up). In contrast, a claim becomes moot when "in the course of litigation a court finds that it can no longer provide a plaintiff with any effectual relief . . . ." *Uzuegbunam v. Preczewski,* 141 S. Ct. 792, 796 (2021); *see Momenta Pharms., Inc. v. Bristol-Myers Squibb Co.,* 915 F.3d 764, 770 (Fed. Cir. 2019) (quoting *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of the City of Milwaukee,* 708 F.3d 921, 929 (7th Cir. 2013) ("In essence, 'mootness is the doctrine of standing set in a time frame; that is, the requisite personal interest that must exist at the time of commencement of the litigation (standing) must continue throughout its existence (mootness).'").

Any argument that the plaintiffs' claims are not redressable because no money remains in the RRF is unavailing. "Congress can also create an obligation directly by statute, without also providing details about how it must be satisfied," and "a subsequent failure to appropriate enough funds neither 'abrogate[s] nor suspend[s]' the Government's pre-existing commitment to pay." *Maine Cmty. Health Option*, 590 U.S. at 309 (quoting *United States v. Langston*, 118 U.S. 389, 394 (1886)). Thus, "the mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute." *N.Y. Airways, Inc. v. United States*, 369 F.2d 743, 748 (1966).

The absence of money in the RRF does not prevent the plaintiffs from recovering money damages, because money damages would not be paid out of the RRF. The Court of Federal Claims does not award equitable relief requiring payment from a specific funding source. Instead, with one exception not relevant here, "every final judgment rendered by the United States Court of Federal Claims against the United States shall be paid out of any general appropriation therefor, on presentation to the Secretary of the Treasury of a certification of the judgment by the clerk and chief judge of the court." 28 U.S.C. § 2517 (entitled "Payment of judgments"). In other words, the Judgment Fund is generally the source for the payment of awards by the Court of Federal Claims. 31 U.S.C. § 1304(a)(3)(A) (appropriating to the Judgment Fund amounts necessary to pay final judgments and settlements payable under 28 U.S.C. § 2517).

It is true that "funds may be paid out [of the Judgment Fund] only on the basis of a judgment based on a substantive right to compensation based on the express terms of a specific statute." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 432 (1990). The fact a plaintiff must have a substantive right to compensation is only jurisdictional, however, to the extent the plaintiff must rely on a money-mandating statute, not that the plaintiff must prove its case on the merits. *See Fisher*, 402 F.3d at 1176 (citing *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999)) (noting that when a "money-mandating statute, applied to the facts proven, did not afford the remedy claimed," it is "a failure on the plaintiff's part to state a claim on which relief

---

plaintiffs have met these requirements by pleading that they were each injured by the SBA's failure to award them the grants they sought. (*See* ECF 1-2.)

could be granted, and not a jurisdictional defect").  The merits of a claim do not affect its redressability because, as Judge Wheeler concluded, "the Judgment Fund is generally available to pay the liabilities of the Government as enforced by this Court. . . . When a statute . . . is money-mandating, the Judgment Fund will always be an appropriation from which the Government's promises can be fulfilled."  *Molina Healthcare of California, Inc. v. United States*, 133 Fed. Cl. 14, 35 (2017).[10]  The exhaustion of funds in the RRF therefore does not go to redressability of the plaintiff's claim for damages because section 9009c is money-mandating; the only question is whether the plaintiffs are entitled to recover money damages on the merits.

Recognizing the problem with its argument (ECF 10 at 9) ("Plaintiffs are generally correct that when a statute is money-mandating, the failure to appropriate funds does not eliminate the Government's payment obligation"), the defendant falls back on the argument that its liability is limited by section 9009c to the already-expended RRF, making the Judgment Fund unavailable and the plaintiffs' claims not redressable.  (*Id.* at 9-10 n.4.)

Under its spending power, Congress can limit the government's liability under money-mandating statutes by making any payment obligation subject to the availability of funds or limiting expenditures to certain amounts.  Such limitations do not, however, present redressability concerns.  Instead, the cases that have addressed the issue of a statutory limitation on expenditures have considered the issue a question of entitlement to recovery.  *See Prairie Cnty., Montana v. United States*, 782 F.3d 685, 691 (Fed. Cir. 2015) (affirming the dismissal of a plaintiff's claim for failure to state a claim because of the existence of a liability cap), *cert. denied*, 577 U.S. 923 (2015); *Greenlee Cnty., Ariz. v. United States*, 487 F.3d 871, 887-81 (Fed. Cir. 2007) (same), *cert. denied*, 552 U.S. 1142 (2008); *Star-Glo Assocs., LP v. United States*, 59 Fed. Cl. 724, 734-35 (2004) (granting summary judgment against a plaintiff when a statutory cap barred recovery), *aff'd on other grounds*, 414 F.3d 1349 (Fed. Cir. 2005).

For example, in *Star-Glo Associates, LP v. United States*, the Federal Circuit considered whether a benefits program intended to compensate citrus growers included a statutory cap on expenditures that barred a claim from two plaintiffs, who claimed the Department of Agriculture had used the wrong definition of "acre" in calculating their grant award.  414 F.3d at 1350-53.  Despite finding there was a statutory expenditure cap that had been met by the time the plaintiffs filed suit, the Federal Circuit did not suggest that it lacked jurisdiction due to any lack of standing by the plaintiffs or lack of redressability.  *Id.* at 1354-55.  Instead, rather than addressing the effect on the statutory cap on expenditures when the cap had not been reached at the time a claim accrued, the Federal Circuit held on the merits that the plaintiffs were not

---

[10] Judge Wheeler's broad language in *Molina* notwithstanding, the Judgment Fund is unavailable if "payment is [ ] otherwise provided for."  31 U.S.C. § 1304(a)(1).  One such example is in cases under the National Vaccine Injury Compensation Program, in which payments for those injuries are made from the Vaccine Injury Compensation Trust Fund, pursuant to 42 U.S.C. § 300aa–15(i)(2) and 26 U.S.C. § 9510.  The defendant has not, however, argued that other funding sources are available, and none is readily apparent, so this limitation is not relevant to the plaintiffs' claims.

entitled to further funds because the Department of Agriculture had used the correct definition of "acre." *Id.* at 1355-58.

In short, when the effect of a cap on expenditures was clear, courts considering such statutory limitations on funding have treated them as an absolute affirmative defense, the success on which by the defendant precluded the award of damages to a plaintiff on the merits. Even in *Star-Glo*, in which a cap on expenditures existed but its effect was unclear, no court ever suggested that the cap presented a threshold jurisdictional issue that would bar consideration of the merits of a claim. The defendant has not identified any contrary authority in which a statute was held to be money-mandating, but a plaintiff's claims were not redressable due to an exhaustion of funds. The question of whether there is a statutory cap limiting the defendant's liability therefore confuses redressability with "whether the plaintiff has established a right to recover, a question which it is inappropriate to treat at this stage of the litigation." *Chafin v. Chafin*, 568 U.S. 165, 174 (2013) (cleaned up).

On mootness, the defendant makes largely the same arguments. It attempts to find additional support in section 9009c(c)(6)'s mandate that any unused grant funds held by eligible entities after March 11, 2023, must be returned to the treasury and in the Fiscal Responsibility Act's rescission of unobligated funds. (ECF 7 at 16-19.) The defendant also cites several district court decisions which dismissed claims raised by eligible entities on mootness grounds because the RRF was exhausted and/or because the plaintiffs raised their claims after March 11, 2023. (*Id.* at 18 (citing *Reboot Macon*, 2023 WL 4672395, at *5; *Keener v. United States*, No. 2:22-1640, 2023 WL 2478367, at *7 (D.S.C. Mar. 13, 2023)).)

The flaw in the defendant's mootness argument, however, lies in the differences between the relief available in the district courts and this court. The district courts under the APA can only award "relief other than money damages." 5 U.S.C. § 702. Any request for injunctive or declaratory relief related to grant applications were rendered academic when the RRF was exhausted because such relief could not cause the plaintiffs to receive any grant money. *See Reboot Macon*, 2023 WL 4672395, at *4 ("Because the RRF has run dry, and because the only relief available to the plaintiffs requires the Court to direct the SBA to process RRF applications in the order that they were received, a depleted RRF renders that requested relief moot and the government is entitled to dismissal."); *Keener*, 2023 WL 2478367, at *7 ("However, if defendants were to show evidence that the RRF program lacks funds, at that point plaintiffs' claims would be moot.").

In contrast, the Court of Federal Claims awards money damages and can only rarely provide injunctive or other equitable relief (outside of bid-protest cases under 28 U.S.C. § 1491(b)) "as an incident of and collateral to any" judgment for money. 28 U.S.C. § 1491(a)(1); *see James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998) (cleaned up) ("Stated another way, the Court of Federal Claims has no power to grant affirmative non-monetary relief unless it is tied and subordinate to a money judgment."). Money damages are paid out of the Judgment Fund and are not orders for the award of money from any other specific funds. 28 U.S.C. § 2517; 31 U.S.C. § 1304(a)(3)(A). An award of money damages therefore would not be subject to the RRF's requirement to return grant funds nor the Fiscal Responsibility Act's rescission of funds as these laws do not include any language affecting monetary awards from the Judgment Fund. The

26

possibility of a damages award therefore is not moot and could provide the plaintiffs with the relief they seek.

The only way for the plaintiffs' claims for money damages to be mooted is for them to receive grants or otherwise be voluntarily compensated by the defendant. Unless and until this happens, their claims are not moot.

To summarize, the plaintiffs' claim that section 9009c, read properly, commands the payment of money to them. *Bowen* does not require the plaintiffs to raise their claims under the APA in district court. The plaintiffs' case does not present *Bowen*'s specific circumstances, and monetary relief is adequate to redress retrospectively their injuries for the SBA's alleged failure to pay them the one-time grants they allege the SBA was obligated to provide under the statute. The plaintiffs therefore present a classic money-mandating claim within the Tucker Act jurisdiction of the Court of Federal Claims, 28 USC § 1491(a). The only way such a claim may be dismissed for lack of jurisdiction is if the statute cannot fairly be construed to command the payment of money; if the plaintiffs fail to allege facts demonstrating they are within the class of beneficiaries entitled to payment under that statute; or if the plaintiffs lack standing. As the plaintiffs have overcome all three hurdles, the plaintiffs' claims are within this court's jurisdiction and would be redressable by the Judgment Fund if the plaintiffs succeed on the merits.

### C.    Rule 12(b)(6)

Although not raised by the parties, the Court *sua sponte* raised the issue of whether the plaintiffs have failed to state a claim because of the possible existence of a cap on the defendant's liability under section 9009c. The parties were directed to file supplemental briefs addressing this issue, specifically:

> 1 – Does 15 U.S.C. § 9009c(b)(2)(A) impose a statutory cap on the amount of money to be spent under the Restaurant Revitalization Fund, or does § 9009c create an uncapped liability to support an award to the plaintiffs, either directly or through the Judgment Fund?
>
> 2 – Presuming that § 9009c caps liability and that § 9009c(c)(1) required the SBA to award grants strictly in the order in which applications were received, does the exhaustion of the available funds through the award of grants to entities who submitted their applications after the plaintiffs foreclose the plaintiffs from stating a claim for relief? What effect does the Fiscal Responsibility Act's de-obligation provision and § 9009c(c)(6)'s requirement that unspent funds be returned to the Treasury have on this question?

(ECF 13).

Without conceding the existence of jurisdiction, the defendant argues that 15 U.S.C. § 9009c(b)(2)(A) imposes a statutory cap that prevents the plaintiffs from stating a claim because

27

**Appx27**

the statute included a specific amount of money to be expended, $28.6 billion.  In support, the defendant relies on language from *Maine Community Health* that noted "'Congress c[an] expressly limit[ ] an obligation to available appropriations or specific dollar amounts.'"  (ECF 16 at 1-2 (quoting 590 U.S. at 313) (edits by the Court).)  Any resort to the Judgment Fund, the defendant argues, would be an inappropriate circumvention of Congress's intent to cap the amount available for the RRF.  (*Id.* at 4-6.)  Instead, the plaintiffs should have challenged the SBA's interpretation of section 9009c(c)(1) and disbursements of funds under the APA while the RRF still contained funds.  (*Id.* at 6-7 & 6-7 n.4.)  Further, the defendant argues that the Fiscal Responsibility Act rescinded any payment obligation because, citing to a district court opinion, the rescinded "'unobligated balances' were those 'funds that the SBA has not yet promised to pay to a specific entity that has applied and been approved for payment.'"  (*Id.* at 9 (quoting *W6 Rest. Grp.*, 2024 WL 1973132, at *9).)  Finally, the defendant reiterates its argument that the obligation to return unspent RRF funds prevents the plaintiff from stating a claim because to allow otherwise would circumvent Congress's intent to forfeit unspent RRF grant awards.  (*Id.* at 10 (citing *Reboot Macon*, 2023 WL 4672395, at *5).)

In contrast, the plaintiffs argue that section 9009c(b)(2)(A) does not impose a statutory cap because the statute is not limited to available appropriations, but instead included a specific appropriation "in addition to amounts otherwise available."  Relying on *Samish Indian Nation v. United States*, the plaintiffs argue that section 9009c(b)(2)(A) only "narrow[ed] the group of entities SBA was obligated to pay (based on the order applications were received)" but did not "limit liability for amounts the agency was obligated to pay."  (ECF 17 at 8-10 (citing 657 F.3d 1330, 1339-41 (Fed. Cir. 2011), *vacated as moot*, 568 U.S. 936 (2012)).)  Even if section 9009c(b)(2)(A) imposed a cap, the plaintiffs argue that they have stated a claim for relief that can be granted because the SBA's erroneous disbursements did not satisfy the SBA's obligation to them.  Citing to the Government Accountability Office's ("GAO") *Principles of Federal Appropriations Law* ("GAO Redbook") and Steven N. Tomanelli, Appropriations Law 43 (2003), the plaintiffs argue that the obligation to pay them arose at the time they submitted their applications.[11]  (ECF 17 at 10-13.)  Any improper payments, the plaintiffs argue, must be paid to them as damages up to the amount appropriated.  (*Id.* at 13-14 (quoting *Sutton v. United States*, 256 U.S. 575, 582 (1921)) ("'Unless the parties can agree as to the facts, the case should be remanded to the Court of Claims to determine what, if any, amount was erroneously charged against the appropriations . . . ; and for the amount of such improper charges, if any, judgment should be entered for the petitioner.'").)  Finally, the plaintiffs argue that the Fiscal

---

[11] The GAO Redbook "present[s] a basic reference work covering the legal issues that arise as the Comptroller General carries out his statutory duties to issue decisions and opinions concerning the use and obligation of appropriated funds."  United States GAO, GAO Redbook Preface (4th ed. 2016), available at https://www.gao.gov/assets/2019-11/675699.pdf.  The Supreme Court, the Federal Circuit, and other circuit courts "have relied on the opinions of the [GAO] as expressed in [the GAO Redbook] . . . whose opinions, while not binding, are 'expert opinion[s], which we should prudently consider.'"  *Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075, 1084 (Fed. Cir. 2003) (citing, *inter alia*, *Lincoln v. Vigil*, 508 U.S. 182, 192, (1993); *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 201 (D.C. Cir. 1984)).

Responsibility Act and section 9009c(c)(6) do not foreclose their claims. As to the former, the plaintiffs emphasize that only "unobligated balances" were rescinded, but that the statute did not attempt to de-obligate any funds that were already due. (*Id.* at 15-16.) And as for the latter, the plaintiffs argue that this provision does not prevent the SBA from re-awarding any recovered erroneous disbursements before they are returned to the treasury and does not affect damages from the Judgment Fund. (*Id.* at 16.)

Section 9009c(b)(2)(A) is unusual; the parties have not cited any precedent involving a statute like it, and the Court has found none either. On the one hand, the statute appropriated a specific sum of money for the RRF. On the other hand, it also authorized the SBA, in a paragraph entitled "Appropriations," to use "amounts otherwise available" for the RRF. Despite appropriating a specific sum of money, the statute was also open-ended and allowed an unspecified amount of money be used for the RRF. This unusual amalgam muddies the water as to whether section 9009c(b)(2)(A) imposed a cap on the defendant's liability, because it did not limit RRF grants to the specific sum of money appropriated to the RRF.

Because the statute here is ambiguous on this point, it is important to examine exactly what the Federal Circuit has done in evaluating whether a funding limit in a money-mandating statute prevents a plaintiff from stating a claim.

As previously noted, in *Star-Glo* the Federal Circuit considered whether a benefits program intended to compensate citrus growers included a statutory funding cap that barred a claim. Section 810(e) of Public Law No. 106-387 (2000) provided that "the Secretary of Agriculture shall use $58,000,000 of the funds of the Commodity Credit Corporation to carry out this section [to compensate citrus tree growers for losses from citrus canker], to remain available until expended." The plaintiffs in the case had previously sought and received funds under the program but then sued, contending the Department of Agriculture had used the wrong type of acreage measure to calculate the compensation due to them. At the time the plaintiffs filed their claims with the Department of Agriculture, the $58 million had not been expended. By the time the plaintiffs filed their lawsuit, however, the $58 million cap had been met. *Star-Glo*, 59 Fed. Cl. at 726-27. The plaintiffs argued that the lack of terms such as "not to exceed" or "not more than" meant there was no statutory cap. Judge Horn held, however, that the exhaustion of the authorized funds barred the plaintiffs' claims. *Id.* at 732-35.

On appeal, the Federal Circuit affirmed. Although the Federal Circuit acknowledged that "the statutory text is ambiguous," after looking to legislative history the Circuit held that the language imposed a funding cap. *Star-Glo*, 414 F.3d at 1354-55. The Federal Circuit relied on language from a conference report in which Congress explained that "section 810 'directs the Secretary of Agriculture to use *not more than* $58,000,000 for replacement of citrus trees and for compensation for losses as a result of citrus canker.'" *Id.* at 1355 (emphasis added by Federal Circuit) (quoting H.R. Conf. Rep. No. 106-948, at 147 (2000)).

Two points distinguish this case from *Star-Glo*. First, even if reliance on legislative history were appropriate in construing the meaning of a statute, no such clarifying legislative history exists for section 9009c and cannot serve to aid in construing the provision. Second, the relevant statute in *Star-Glo*, unlike section 9009c, did not provide for any potentially available

29

additional funds beyond the $58 million appropriated.  Further, the Federal Circuit did not ultimately base its decision in *Star-Glo* on the effect of the cap on expenditures in the statute. Instead, the court held that the plaintiffs were not entitled to recover on the merits of their claim. *Id.* at 1356-58.

The Federal Circuit did expressly reach the effect of a cap on expenditures in *Greenlee County*.  In that case, Federal Circuit addressed the Payment in Lieu of Tax Act ("PILT Act"), 31 U.S.C. § 6901 et seq., a statute "enacted to compensate local governments for the loss of tax revenues resulting from the tax-immune status of federal lands located in their jurisdictions, and for the cost of providing services related to these lands." *Greenlee Cnty.*, 487 F.3d at 873 (cleaned up).  Greenlee County had not received the amounts due to it under the statute because Congress had not appropriated sufficient funds. *Id.* at 874.

According to the version of 31 U.S.C. § 6906 in effect at the time, the PILT Act provided that the amounts to fund the compensation "are available only as provided in appropriations law."  Based on that explicit provision, the Federal Circuit upheld a dismissal for a failure to state a claim because "the government's liability is capped" under the plain text of the statute. *Greenlee Cnty.*, 487 F.3d at 879.  The Federal Circuit noted that "[t]he fact that *Star-Glo* involved a specific dollar amount while the statute here refers to 'amounts . . . provided in appropriation laws' is a distinction without a difference." *Id.*  The Federal Circuit, relying on prior caselaw in which the phrase "subject to the availability of appropriations" had been found to limit the government's liability in contract cases, held that there was no functional difference between such language and the language of the PILT Act. *Id.* at 878 (citing *Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631, 643 (2005); *Babbitt v. Oglala Sioux Tribal Public Safety Dep't*, 194 F.3d 1374, 1380 (Fed. Cir. 1999)).  In so doing, the Federal Circuit noted that "'there is greater room' in benefits programs to find the government's liability limited to the amount appropriated." *Id.* at 879 (quoting *Star-Glo*, 414 F.3d at 1355).

The Federal Circuit would later reiterate its conclusions from *Greenlee County* in *Prairie County*, another case arising under the PILT Act.  The Federal Circuit in *Prairie County* summarized that "the question here is whether the statute reflects congressional intent to limit the government's liability for PILT payments, or whether PILT imposes a statutory obligation to pay the full amounts according to the statutory formulas regardless of appropriations by Congress." 782 F.3d at 690.  It answered this question by emphasizing that "[t]he inclusion of the word 'only' limits the availability of PILT payments to appropriations." *Id.*  Congress did not, however, employ the limiting words "only" or "subject to the availability of appropriations" in section 9009c.

*Greenlee County* left open the question of what would happen when sufficient unrestricted amounts remained available and whether those reprogrammable funds could cover the obligation.  The Federal Circuit did note, however, that "[t]he Supreme Court recently addressed this issue in *Cherokee Nation* in the context of a contract case and concluded that the presence of sufficient unrestricted lump-sum appropriations (not specifically appropriated for the program in issue) to meet the government's contractual obligation qualified as available appropriations." *Greenlee Cnty.*, 487 F.3d at 880 n.3 (citing *Cherokee Nation of Oklahoma*, 543 U.S. at 641).

30

Compared to those cases, however, the text of the RRF statute is more ambiguous. The plaintiffs point to the open-ended nature of section 9009c(b)(2)(A) ("In addition to amounts otherwise available . . . ."), while the defendant points to the specific sum allocated to the RRF ("[T]here is appropriated to the Restaurant Revitalization Fund for fiscal year 2021, out of any money in the Treasury not otherwise appropriated, $28,600,000,000, to remain available until expended . . . ."). Neither party has presented any evidence of legislative history, and none appears to exist specifically concerning section 9009c(b)(2)(A).

On its face, the plaintiffs have the better argument as to the interpretation of section 9009c. Section 9009c either sets a specific amount of money aside for the RRF or is open-ended, but it cannot be both. Given that one part of section 9009c(b)(2)(A) is open-ended, providing that funds are appropriated "[i]n addition to amounts otherwise available," the entire provision must be read so as not to set a specific cap on the funds available for the RRF.

The open-ended statutory add-on that Congress allocated to the RRF by allowing the SBA to spend "amounts otherwise available" in addition to the $28.6 billion it specifically allocated is crucial. The Supreme Court has explained that "Congress could have expressly limited an obligation to available appropriations or specific dollar amounts." *Maine Cmty. Health*, 590 U.S. at 313. For the RRF, Congress chose instead to provide a specific sum of money "[i]n addition to amounts otherwise available." The formulation Congress used in section 9009c(b)(2)(A) on its face therefore does not express a congressionally mandated limit on the RRF's funding to a *specific* dollar amount. This lack of a specific limitation makes this case seem closer to *Maine Community Health*, in which Congress simply never provided the funds necessary to fulfill the government's statutory obligations, rather than a case in which Congress limited the government's obligations to a specific sum of money, as in *Star-Glo*.

The RRF statute is also different from the ones previously considered by the Federal Circuit because section 9009c lacks phrases like "available only as provided in appropriations laws" or "subject to the availability of appropriations." These were the phrases the Federal Circuit found in *Greenlee County* to reflect a cap. While section 9009c, like the statute in *Star-Glo*, does use the phrase "to remain available until expended," as noted above, that case is distinguishable because of the RRF's open-ended appropriations provision and the lack of any relevant legislative history of the kind the Federal Circuit relied on in *Star-Glo*.

Applying the factors deemed important by the Federal Circuit in its precedents to the apparently unprecedented language of the RRF statute leads to the conclusion that section 9009c does not impose a cap on the defendant's liability because the statutory text does not demonstrate Congress's intent to limit the defendant's liability to the specific amount appropriated. Rather, section 9009c(b)(2)(A) demonstrates that Congress provided a minimum sum of money for the RRF, while also allowing other, unspecified, additional amounts to be used.

Admittedly, the Federal Circuit has repeatedly noted that "'there is greater room' in benefits programs to find the government's liability limited to the amount appropriated." *Greenlee Cnty.*, 487 F.3d at 879 (quoting *Star-Glo*, 414 F.3d at 1355); *Prairie Cnty.*, 782 F.3d at 689 (same). This statement by the Federal Circuit, however, is little more than dicta, as these cases do not purport to establish a controlling interpretive cannon of construction for benefits-

31

**Appx31**

granting statutes. Regardless, "greater room" cannot read into the RRF statute a limitation on the defendant's liability that does not exist. Instead, it is the statutory language itself, not a general principle, that must control. Read together, the statute's appropriation of a specific sum of money and its provision of an additional unlimited "amounts otherwise available" produce a conclusion that section 9009c(b)(2)(A) does not limit the government's liability to a specific sum of money.

 While Congress did not limit the defendant's liability, that conclusion does not mean that the defendant's liability for the RRF is completely uncapped.[12]  Section 9009c(b)(3) only requires expenditure of funds in the RRF.  This limitation *de facto* creates a cap on the government's liability because, as previously noted, the payment obligation of section 9009c only flows to money in the RRF.  The practical effect is that any claims for damages must be limited to a claim that a plaintiff was entitled to receive funds that were at one point in the RRF but were misspent, even if additional sums could have been added to it by the "amounts otherwise available" provision.  There is no indication, however, that Congress intended section 9009c(b)(2)(A) to be a *de jure* cap on spending for the RRF that would limit the defendant's liability under Federal Circuit precedent.  Whether a statute is money-mandating and whether a plaintiff falls within the class as to whom the statute is money-mandating present separate questions from whether Congress created a statutory cap on the defendant's liability; these distinct questions should not be conflated.  In this case, limited to the requirements imposed by section 9009c, the exhaustion of the funds in the RRF neither deprives this court of jurisdiction nor prevents the plaintiffs from stating a claim.

 Even if there were a cap on the defendant's liability, "[t]he question [would] remain[ ], however, as to the effect of the cap." *Star-Glo*, 414 F.3d at 1355.  In the relevant Federal Circuit precedents, the plaintiffs were seeking damages under the Tucker Act because Congress had failed to appropriate sufficient funds to pay the full amounts of its outstanding obligations; there was no question as to whether the government had made improper payments to undeserving applicants in violation of federal law.  The plaintiffs here, however, claim there would have been sufficient funding available to pay them had the SBA not misinterpreted the statute and made award to the wrong applicants, contrary to Congress's express command in section 9009c(c)(1).

 This difference is key.  The plaintiffs argue that Congress directed the SBA to provide grants to one group of businesses, and the SBA instead awarded them to a different group.  The defendant cannot evade its obligations by paying the wrong entities out of the RRF and then claiming there is no money left to pay the plaintiffs, the text of the statute notwithstanding.  The plaintiffs therefore do not seek to use the Judgment Fund to circumvent Congress's failure to fund the RRF with sufficient funds to cover all applications.  Instead, they seek to be compensated for the failure to pay them funds they contend should have been awarded to them in

---

 [12] Although the plaintiffs have argued that section 9009c(b)(2)(A) is not a cap on the defendant's liability, even they have not argued that section 9009c is an uncapped liability that required the government to make grants to all applicants.  In other words, even the plaintiffs agree there exists some limit on the expenditures the SBA had to make under the RRF.

the first place rather than to other applicants.  In short, the plaintiffs seek to effectuate Congress's intent from the plain text of section 9009c, contrary to the SBA's administration of the law, which contravened that express intent.

Existing caselaw does not extend to this scenario, and it appears to be a question of first impression.  In the absence of caselaw holding that a plaintiff cannot state a claim under these circumstances, there is no reason to extend a doctrine here when it would frustrate Congress's intent to compensate the plaintiffs for their pandemic-related loss because of the SBA's misinterpretation of section 9009c(c)(1).  Instead, it makes sense to effectuate Congress's intent that the plaintiffs receive such money by allowing them to recover money damages.

No funding cap exists in section 9009c to limit the defendant's liability for the allegedly illegal actions of the SBA.  The plaintiffs' claims may proceed to the merits.

## IV.     CONCLUSION

The plaintiffs have stated a claim within the jurisdiction of this court and have stated a claim on which relief can be granted.  Accordingly, the defendant's motion to dismiss (ECF 7) is denied.  A separate order reflecting this outcome is being filed concurrently with this opinion.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**

33

**Appx33**

# In the United States Court of Federal Claims

No. 23-1876C
Filed: July 24, 2024

---

**112 GENESEE STREET, LLC, et al,**

                *Plaintiffs,*

**v.**

**UNITED STATES,**

                *Defendant.*

---

## ORDER

For the reasons provided in the memorandum opinion filed concurrently with this order, the defendant's motion to dismiss (ECF 7) is **DENIED**. In consultation with the parties, the Court will schedule an in-person status conference to review further proceedings.

It is so **ORDERED**.

s/ Richard A. Hertling

**Richard A. Hertling**
**Judge**

# In the United States Court of Federal Claims

No. 23-1876C
Filed: October 24, 2024
NOT FOR PUBLICATION

---

**112 GENESEE STREET, LLC, et al.,**

          *Plaintiffs,*

**v.**

**UNITED STATES,**

          *Defendant.*

---

*F. Greg Bowman*, Williams & Connolly LLP, Washington, D.C., with *Edward Reddington* and *Robel Yared*, of counsel, for the plaintiffs.

*Rebecca S. Kruser*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for the defendant.

## MEMORANDUM OPINION

**HERTLING**, Judge

On October 7, 2024, the defendant moved to certify the Court's Order of July 24, 2024 (ECF 19), and the accompanying memorandum opinion (ECF 18), *see 112 Genesee Street, LLC v. United States*, 172 Fed. Cl. 426 (2024), for an interlocutory appeal and to stay further proceedings pending the Federal Circuit's resolution of the petition and the appeal. (ECF 27.) The plaintiffs opposed the motion on October 14, 2024. (ECF 28.)

The plaintiffs are 303 restaurant, bar, and catering businesses. They sued the United States, acting through the Small Business Administration ("SBA"), claiming that they were entitled to receive grants under the Restaurant Revitalization Fund ("RRF"), a program enacted by Congress to support restaurants and related businesses for losses incurred during the COVID-19 pandemic and accompanying business disruptions. The plaintiffs seek monetary damages equal to the amounts sought in their unpaid grant applications, alleging they are entitled to these payments under 15 U.S.C. § 9009c(c)(1) required the SBA to "award grants to eligible entities in the order in which applications are received by the Administrator," but the SBA instead made payments to applicants in the order in which it processed the applications. The plaintiffs allege that, had the SBA made the grants in the order the applications were received, sufficient funds would have been left for them to receive grants.

The defendant moved to dismiss under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), arguing that the plaintiffs' claims are beyond the jurisdiction of the Court of

Federal Claims because: (1) the plaintiffs lack standing due to a lack of redressability for their alleged injury; (2) their claims are moot; (3) 15 U.S.C. § 9009c is not money-mandating and cannot support a claim under the Tucker Act; and (4) the court lacks jurisdiction over claims of arbitrary and capricious as well as negligent conduct by the SBA.

During oral argument on the motion to dismiss, the Court *sua sponte* raised the question of whether 15 U.S.C. § 9009c caps the funds authorized for the RRF and, if so, whether such a cap limits the defendant's liability to the funds already spent, thereby preventing the plaintiffs from stating a claim for relief under Rule 12(b)(6). The parties filed supplemental briefs on that issue.

The defendant's motion to dismiss was denied. The plaintiffs were found to have properly brought claims under the Tucker Act for damages under a money-mandating statute. The plaintiffs were also found to have successfully stated a claim.

The defendant moves to certify two questions for interlocutory appeal. First, whether 15 U.S.C. § 9009c is a money-mandating statute authorizing suits for damages; and second, whether the plaintiffs failed to state a claim upon which relief can be grated because 15 U.S.C. § 9009c(b)(2)(A) limits the government's liability, the statutory covered period has expired, and Congress "permanently rescinded any unobligated balances of the $28.6 billion made available for the [RRF]." (ECF 27 at 5-6.)

Either issue presents a controlling question of law with respect to which there are substantial grounds for difference of opinion. An immediate appeal from the order may materially advance the ultimate termination of the litigation. The defendant's motion to certify the earlier order for an interlocutory appeal is granted. The defendant's motion to stay will be granted in part.

An appeal of an otherwise unappealable order may be certified when it includes the certification required by 28 U.S.C. § 1292(d)(2):

> when any judge of the United States Court of Federal Claims, in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

The law disfavors piecemeal appeals and typically allows an appeal only of a final judgment. 28 U.S.C. 1291). As Judge Allegra noted almost 20 years ago, "[i]t is well-accepted that interlocutory appeals under [section 1292(d)(2)] are reserved for 'exceptional' or 'rare' cases and should be authorized only with great care." *Klamath Irrigation Dist. v. United States*, 69 Fed. Cl. 160, 161 (2005).

The law requires that before certifying an issue for an interlocutory appeal a court find the existence of three distinct factors: (1) that "a controlling question of law is involved"; (2) that this question of law involves "a substantial ground for difference of opinion"; and (3) that an immediate interlocutory appeal "may materially advance the ultimate termination of the litigation." *See Aleut Tribe v. United States*, 702 F.2d 1015, 1019 (Fed. Cir. 1983).

As to the first factor, a question of law is controlling when resolving it would "materially affect issues remaining to be decided in the trial court." *Coast Fed. Bank, FSB v. United States*, 49 Fed. Cl. 11, 13 (2001) (internal quotes omitted). Moreover, "a question of law can be controlling even if resolving it leaves factual issues for resolution in the lower court." *Doe No. 1 v. United States*, 163 Fed. Cl. 608, 612 n.5 (2023).

As to the second, a substantial ground for a difference of opinion on a controlling question of law arises when the decision (1) is in tension with other decisions from other courts, or (2) involves a novel issue or one of first impression. *Coast Fed. Bank*, 49 Fed. Cl. at 13. A question of first impression is not sufficient on its own, however, to meet the statutory standard. *See* Matthew H. Solomson, Court of Federal Claims Jurisdiction, Practice, and Procedure, 33-16 (2016).

The third statutory factor will be dependent on the facts of each case.

The defendant argues that the opinion and order denying its motion to dismiss meet the requirements of section 1292(d)(2). The defendant cites five points over which substantial grounds for differences of opinion exist. These are: (1) whether the structure of the RRF statute meets the Supreme Court's conception of a money-mandating statute; (2) whether the statutory language is sufficiently non-discretionary to mandate payment under Federal Circuit precedent; (3-4) whether the Tucker Act's waiver of sovereign immunity confers jurisdiction to hear the plaintiffs' claims, including whether the parties' competing interpretations of *Maine Community Health Options v. United States*, 590 U.S. 296 (2020) and *Bowen v. Massachusetts*, 487 U.S. 879 (1988); and (5) whether, as a matter of first impression, the SBA had made improper payments to unentitled applicants in violation of federal law. (ECF 27 at 10.) These five distinct issues can be boiled down to two questions: whether 15 U.S.C. § 9009c is money-mandating statute and whether the plaintiffs have stated a claim for relief under that statute.

The defendant argues that an immediate appeal will materially advance the termination of the case and avoid unnecessary expense and delay. The defendant argues that by raising these issues now instead of in a post-judgment appeal, years of discovery and piecemeal litigation may be avoided. Moreover, it argues, the resolution of these dispositive questions will be likely to accelerate and simplify the trial-court proceedings. The defendant also requests a stay, arguing that discovery may be unnecessary upon the resolution of the interlocutory appeal. (*Id.* at 14.)

In response, the plaintiffs argue that section 9009c is facially money-mandating, that their claims are properly brought under the Tucker Act rather than the Administrative Procedure Act, and that the defendant fails to identify any substantial question regarding whether the plaintiffs have stated a claim upon which relief can be granted. Moreover, the plaintiffs claim that an interlocutory appeal would not materially advance the ultimate termination of the litigation because, if the Federal Circuit affirms, the defendant will likely raise a distinct set of defenses

3

**Appx37**

that could require a second appeal after a final judgment. The plaintiffs maintain that it would be more expedient to resolve all relevant legal issues in a single appeal. (ECF 28.)

The plaintiffs also request that, in the event the defendant's motion is granted, further proceedings not be stayed. The plaintiffs argue that because they are small businesses, any prolonged delay could result in their inability to proceeded in the litigation. Further, the plaintiffs claim that discovery "will not be unreasonably burdensome" and could proceed in tandem with the interlocutory appeal. (*Id.* at 18.)

### A. Controlling Questions of Law

The issues of whether 15 U.S.C. § 9009c is money-mandating and whether the plaintiffs have stated a claim are controlling questions of law. The resolution of either question would "materially affect issues remaining to be decided in the trial court" and are therefore "controlling." *Coast Fed. Bank* 49 Fed. Cl. at 13. Moreover, the ultimate resolution of all the factual issues and any follow-on legal questions is dependent on the resolution of these underlying legal questions. *Id.* at 612.

The resolution of whether section 9009c is money-mandating will materially affect the issues remaining for decision in the trial court, because the question determines whether subject-matter jurisdiction exists over the plaintiffs' claims. *See Am. Mgmt. Sys., Inc. v. United States*, 57 Fed. Cl. 275, 276 (2003) (a jurisdictional issue "constitutes an appropriate question for certification."). Subject-matter jurisdiction is a threshold issue. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). Without it, the plaintiffs' complaint must be dismissed. RCFC 12(h)(3).

In addition, whether the claim that the SBA made improper payments to undeserving applicants states a claim upon which relief can be granted is also controlling and will necessarily affect the future of the litigation. *See Doe No. 1*, 163 Fed. Cl. at 612. A finding by the Federal Circuit on this issue of first impression would require the cases dismissal and as a result would "'materially affect [the] issue remaining to be decided.'" *Coast Fed. Bank*, 49 Fed. Cl. at 13 (quoting *Pikes Peak Fam. Hous. LLC v. United States*, 40 Fed. Cl. 673, 686 (1998)).

### B. Substantial Ground for Difference of Opinion

Each party made strong arguments in favor of its position during the briefing on the motion to dismiss and the supplemental briefing following oral argument. On the two issues on which the defendant seeks to appeal, the substantial amounts of briefing and time during oral arguments devoted to these topics illustrate the differences of opinion on these issues. *See Fairholme Funds, Inc. v. United States*, 147 Fed. Cl. 126, 130 (2020) (recognizing substantial room for disagreement on an issue when parties dedicated extensive briefing to the topic).

The fundamental dispute is whether the plaintiffs have presented a claim within the Tucker Act jurisdiction of the Court of Federal Claims. The nature of the underlying statute and its implementation present distinctive and novel issues. Cases from the Federal Circuit interpreting *Maine Community Health* and its gloss on *Bowen* are few, but of great importance to defining the contours and limits of Tucker Act jurisdiction.

4

**Appx38**

The defendant claims the denial of its motion to dismiss is in tension with binding precedent holding that a statute providing for the payment of forward-looking grants is not money-mandating. *See Maine Cmty. Health Option*, 590 U.S. at 326-27. The defendant cites to the Federal Circuit's decision in *Lummi Tribe* to support its position that a statute requiring grants was not money-mandating. *Lummi Tribe of the Lummi Rsrv., Washington v. United States*, 870 F.3d 1313, 1317 (Fed. Cir. 2017).

The plaintiffs dispute the defendant's contention that a finding that section 9009c is not money-mandating would divest the court of jurisdiction. Citing *Fisher*, they argue that "[i]t is the statute, not the Government official, that provides for the payment. If the Government official's determinations under the statute are in error, the court is there to correct the matter." (ECF 28 at 9 (citing *Fisher v. United States*, 402 F.3d 1167, 1175 (Fed. Cir. 2005).) Further, they argue that the statute need only be money-mandating as to the class to which the plaintiffs belong. (ECF 28 at 8 (citing *Roberts v. United States*, 745 F.3d 1158, 1162 (Fed. Cir. 2014).)

Both parties acknowledge to some extent this question is one of first impression. *Coast Fed. Bank*, 49 Fed. Cl. at 13 (a "substantial ground for a difference of opinion" on a controlling question of law may arise when the [question] . . . involves a novel issue or one of first impression). While that factor alone will not justify allowing an interlocutory appeal, that is not the lone factor here.

The denial of the motion to dismiss is not without uncertainty. The underlying issue presents a question of importance to the government and potentially to Congress in the effect of the language it may choose to employ in enacting future grant programs.

The importance and novelty of the issue and the ability of both parties to cite Supreme Court and Federal Circuit precedent in support of their arguments are sufficient to demonstrate that there exists "substantial ground for a difference of opinion."

As to whether the plaintiffs have stated a claim, the substantial ground for difference of opinion arises from the issue's novelty and lack of guiding precedent. *See Coast Fed. Bank*, 49 Fed. Cl. at 13. As to this issue as well, the statute was found to present a case of first impression. *112 Genesee*, 172 Fed. Cl. at 454-55. The distinctive and unusual language used by Congress in enacting the RRF program led to an extended review of whether the law imposes a cap on liability and the redressability of the plaintiffs' alleged injuries. Because of the novelty of the statutory language, there is a paucity of applicable precedent. Both parties were able to point to Federal Circuit precedents to support their positions.

Here again, the issue is uncertain, the statutory language novel, and a resolution may be important to Congress in enacting new grant programs. The novelty, uncertainty, and importance of the issue warrant appellate review at this stage of the case.

## C.   Immediate Appeal May Materially Advance the Litigation

Finally, both issues certified for appeal create the potential for dismissal without consideration of the merits of the claims. As a result, an immediate appeal "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(d)(2); *See Atkins N. Am., Inc. v. United States*, No. 09-112 C, 2012 U.S. Claims LEXIS 1496, at *3 (Fed. Cl. Nov. 28,

**Appx39**

2012) (finding an immediate appeal might materially advance the termination of the case because it could result in the dismissal of the case for lack of jurisdiction).

If, upon review, the Federal Circuit holds that section 9009c is not money-mandating, the plaintiffs' claims would fall beyond the scope of the Tucker Act's waiver of sovereign immunity, and the complaint would have to be dismissed. The same is true on the question of whether the plaintiffs have stated a claim for relief. If they have not because Congress capped the government's liability, dismissal will be required.

A ruling on both issues has the potential to result in a more expeditious and efficient resolution of the case. In the interest of judicial economy, it would be inefficient to proceed to the merits of the case before receiving a definitive ruling on the preliminary questions of whether the case may proceed to the merits.

Despite the plaintiffs' argument to the contrary, there is little prospect of future appeals if the Court of Appeals affirms the denial of the motion to dismiss. At that stage, section 9009c will effectively have been found to be money-mandating, and the defendant's liability uncapped, at least as to relief from the Judgment Fund. A determination as to the facts underlying the claim of each plaintiff, and whether each plaintiff is entitled to relief will be all that remains for resolution. With 303 plaintiffs, that review will be fact- and labor-intensive, but the outcome for each plaintiff is unlikely to provoke any further appeal by the defendant.

Were the motion to be denied and the case proceed to the merits, discovery and resolution of the claim of each plaintiff will take time, and ultimately the defendant will appeal a final judgment. The plaintiffs will not see relief until that appeal is resolved. Relief for each plaintiff may be expedited were the defendant to lose an appeal now of the preliminary legal issues.

The factors here counsel in favor of allowing the defendant to seek to pursue an interlocutory appeal under section 1292(d)(2).

### D. Stay of Discovery and Further Proceedings

The defendant has also requested that discovery and further proceedings be stayed until resolution of the interlocutory appeal. Under 28 U.S.C. § 1292(d)(3), the granting of an interlocutory appeal by a district judge shall not stay proceedings in the trial court unless the judge orders a stay. The statute implies that even if a case is certified for an interlocutory appeal, Congress established a preference against staying litigation in the trial court during the appeal. The statute does leave the decision to stay a case to the trial judge exercising discretion under the facts of each case. In evaluating whether to stay a case that the trial court has certified for an interlocutory appeal, the trial judge should consider whether a stay would promote judicial economy and benefit the parties. *Doe No. 1*, 163 Fed. Cl. at 614; *see Unionbancal Corp. & Subsidiaries v. United States*, 93 Fed. Cl. 166, 167 (2010).

The defendant seeks to avoid the burdens and costs of discovery; the plaintiffs seek to avoid the delay of a final resolution and payment of damages if they prevail on appeal, and discovery were to start only after the appeal is resolved. If the defendant is successful on its appeal, any time and resources expended in discovery will have been wasted. The defendant represents that discovery the plaintiffs seek from the SBA will be burdensome and time-

6

**Appx40**

consuming.  Similarly, discovery by the defendant into whether each of the 303 plaintiffs was qualified to receive RRF payments may be time-consuming.  If the plaintiffs prevail on appeal, discovery is therefore likely to consume substantial resources and take many months.

Many of the plaintiffs are small businesses.  If they are entitled to recover what they should have received under the RRF, extended delays from discovery on remand will place additional strain on them.

Balancing the various efficiencies and burdens, the Court will stay discovery until the Court of Appeals decides whether to allow this interlocutory appeal to proceed.  If the appeal is accepted, further proceedings, including discovery, will be stayed pending completion of the briefing in the Court of Appeals.  The parties will be required to notify the Court when briefing in the Court of Appeals has been completed, and the Court will hear from the parties at that time about a schedule for further proceedings, including discovery.

## II.    CONCLUSION

The requirements for interlocutory appeal are satisfied.  The order denying the motion to dismiss involves controlling questions of law with respect to which there are substantial grounds for difference of opinion, and an immediate appeal from the order may materially advance the ultimate termination of the litigation.  Accordingly, the defendant's motion to certify interlocutory appeal is granted.  The prior order (ECF 19) denying the motion to dismiss will be amended to reflect that this case meets the criteria for an appeal pursuant to 28 U.S.C. § 1292(d)(2).  Further proceedings will be stayed until briefing in the Court of Appeals is completed.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**

7

**Appx41**

# In the United States Court of Federal Claims

No. 23-1876C

Filed: October 24, 2024

---

**112 GENESEE STREET, LLC, et al,**

          *Plaintiffs,*

**v.**

**UNITED STATES,**

          *Defendant.*

---

## AMENDED ORDER

For the reasons provided in the memorandum opinion filed on July 24, 2024 (ECF 10), the defendant's motion to dismiss (ECF 7) is **DENIED**.

This order involves controlling questions of law with respect to which there are substantial grounds for difference of opinion, and an immediate appeal from the order may materially advance the ultimate termination of the litigation. Accordingly, the defendant's motion (ECF 27) to certify interlocutory appeal pursuant to 28 U.S.C. § 1292(d)(2) is **GRANTED**.

The defendant's motion (ECF 27) to stay further proceedings pending appeal is **GRANTED**. Further proceedings, including the filing of the answer and any discovery, are **STAYED**.

If the Court of Appeals does not accept the appeal, this stay shall terminate automatically. If the Court of Appeals accepts the appeal, the parties shall file a notice within five (5) days of the completion of briefing of the appeal. After that notice is filed, the Court will hold a status conference to address a schedule for future proceedings.

It is so **ORDERED**.

s/ Richard A. Hertling

**Richard A. Hertling**
**Judge**

**Appx42**

# US Court of Federal Claims
## United States Court of Federal Claims (COFC)
## CIVIL DOCKET FOR CASE #: 1:23-cv-01876-RAH

112 GENESEE STREET, LLC et al v. USA

Assigned to: Judge Richard A. Hertling

Demand: $253,000,000

Cause: 28:1491 Tucker Act

Date Filed: 10/25/2023

Jury Demand: None

Nature of Suit: 516 Miscellaneous - Damages

Jurisdiction: U.S. Government Defendant

**Plaintiff**

**112 GENESEE STREET, LLC**     represented by    **Frank Bowman**
Williams & Connolly LLP
680 Maine Avenue SW
Washington, DC 20024
202-434-5000
Email: fbowman@wc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**1233 POLK STREET, LLC**     represented by    **Frank Bowman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**1490 RESTAURANT, INC.**     represented by    **Frank Bowman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**160 FOOD CORPORATION**     represented by    **Frank Bowman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Appx43**

**Plaintiff**

**1651 FOOD CORPORATION**     represented by     **Frank Bowman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**1900 UNIVERSITY BLVD LLC**     represented by     **Frank Bowman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**316 W 49TH RESTAURANT
CORPORATION**     represented by     **Frank Bowman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**341 FRAME, INC.**     represented by     **Frank Bowman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**37 N MAIN STREET
ENTERPRISES, LLC**     represented by     **Frank Bowman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**413 BEDFORD DRIVE LLC**
*et al.*     represented by     **Frank Bowman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**USA**     represented by     **Rebecca Sarah Kruser**
United States Department of
Justice

1100 L Street, N.W.
Washington, DC 20530
(202) 305-2035
Email: rebecca.s.kruser@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/25/2023 | 1 | COMPLAINT against USA (SBA) (Filing fee $402, Receipt number AUSFCC-9106480) (Copy Served Electronically on Department of Justice), filed by All Plaintiffs.**Answer due by 12/26/2023.** (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A)(ew) (Entered: 10/26/2023) |
| 10/25/2023 | 2 | Rule 7.1 Disclosure Statement, filed by All Plaintiffs. Service: 10/25/2023.(ew) (Entered: 10/26/2023) |
| 10/26/2023 | 3 | Notice of Random Assignment Pursuant to Rule 40.1(a) to Judge Richard A. Hertling. (ew) (Entered: 10/26/2023) |
| 10/26/2023 | 4 | NOTICE of Designation of Electronic Case. (ew) (Entered: 10/26/2023) |
| 11/06/2023 | 5 | NOTICE of Appearance by Rebecca Sarah Kruser for USA . (Kruser, Rebecca) (Entered: 11/06/2023) |
| 12/15/2023 | 6 | Unopposed MOTION for Extension of Time until 2/26/2024 to File Answer re 1 Complaint, *or otherwise respond to the complaint*, filed by USA.**Response due by 12/29/2023.**(Kruser, Rebecca) (Entered: 12/15/2023) |
| 12/15/2023 | | ORDER Granting 6 Motion for Extension of Time to File Answer. **Answer due by 2/26/2024.** Issued by Judge Richard A. Hertling. (agg) Service on parties made. (Entered: 12/15/2023) |
| 02/26/2024 | 7 | MOTION to Dismiss pursuant to Rule 12(b)(1) , filed by USA.**Response due by 3/25/2024.**(Kruser, Rebecca) (Entered: 02/26/2024) |
| 03/25/2024 | 8 | RESPONSE to 7 MOTION to Dismiss pursuant to Rule 12(b)(1) , filed by All Plaintiffs.**Reply due by 4/8/2024.** (Bowman, Frank) (Entered: 03/25/2024) |

**Appx45**

| 03/29/2024 | 9 | Unopposed MOTION for Extension of Time to File Reply as to 7 MOTION to Dismiss pursuant to Rule 12(b)(1) , filed by USA.**Response due by 4/12/2024.**(Kruser, Rebecca) (Entered: 03/29/2024) |
|------------|---|---|
| 03/29/2024 | | ORDER granting 9 Motion for Extension of Time to File Reply. **Reply due by 4/22/2024.** Signed by Judge Richard A. Hertling. (tbss) Service on parties made. (Entered: 03/29/2024) |
| 04/22/2024 | 10 | REPLY to Response to Motion re 7 MOTION to Dismiss pursuant to Rule 12(b)(1) , filed by USA. (Kruser, Rebecca) (Entered: 04/22/2024) |
| 04/30/2024 | 11 | ORDER Setting Oral Argument/Hearing on 7 Motion to Dismiss pursuant to Rule 12(b)(1): **Oral Argument set for 5/22/2024 at 09:30 AM EDT in Courtroom 5 before Judge Richard A. Hertling.** Signed by Judge Richard A. Hertling. (tbss) Service on parties made. (Entered: 04/30/2024) |
| 04/30/2024 | | Scheduled Proceeding Hearing Set: REPORTER PRESENT. Oral Argument set for 5/22/2024 09:30 AM in Courtroom 5 before Judge Richard A. Hertling. (tb) (Entered: 04/30/2024) |
| 05/13/2024 | 12 | NOTICE of Additional Authority , filed by USA. (Attachments: # 1 Exhibit)(Kruser, Rebecca) (Entered: 05/13/2024) |
| 05/17/2024 | | **REVISED** Scheduled Proceeding Hearing Set: REPORTER PRESENT. Oral Argument set for 5/22/2024 09:30 AM in Courtroom 4 before Judge Richard A. Hertling. (py) (Entered: 05/17/2024) |
| 05/22/2024 | | Minute Entry - Was the proceeding sealed to the public? No. If Yes, only parties to the case may order a copy of the transcript. Proceeding held in Washington, D.C. on 5/22/2024 before Judge Richard A. Hertling: Oral Argument. [Total number of days of proceeding: 1]. Official record of proceeding taken by court reporter. To order a certified transcript or an audio recording of the proceeding, click HERE. (tbss) (Entered: 05/22/2024) |
| 05/22/2024 | 13 | SUPPLEMENT BRIEF SCHEDULING ORDER: **The parties shall each submit a ten-page supplemental brief no later than 6/5/2024 addressing the questions set forth in this order.** Signed by Judge Richard A. Hertling. (tbss) Service on parties made. (Entered: 05/22/2024) |
| 05/29/2024 | 14 | Notice of Filing Certified Transcript for proceedings held on May 22, 2024 in Washington D.C. (aoc). (Entered: 05/29/2024) |

**Appx46**

| 05/29/2024 | 15 | CERTIFIED TRANSCRIPT of proceedings held on 05/22/2024 before Judge Richard A. Hertling. Total No. of Pages: 1-147. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the transcript, click HERE. Notice of Intent to Redact due 6/5/2024. Redacted Transcript Deadline set for 6/26/2024. Release of Transcript Restriction set for 8/26/2024. (aoc) (Entered: 05/29/2024) |
|---|---|---|
| 06/05/2024 | 16 | SUPPLEMENTAL BRIEF re: 13 Motions Scheduling Order, , filed by USA. (Kruser, Rebecca) (Entered: 06/05/2024) |
| 06/05/2024 | 17 | SUPPLEMENTAL BRIEF re: 13 Motions Scheduling Order, , filed by All Plaintiffs. (Bowman, Frank) (Entered: 06/05/2024) |
| 07/24/2024 | 18 | REPORTED OPINION denying 7 Defendant's Motion to Dismiss - Rule 12(b)(1). Signed by Judge Richard A. Hertling. (tbss) Service on parties made. (Main Document 18 replaced on 7/24/2024 to correct a typographical error) (aoc). Modified on 7/24/2024 (aoc). (Entered: 07/24/2024) |
| 07/24/2024 | 19 | ORDER denying 7 Defendant's Motion to Dismiss - Rule 12(b)(1). In consultation with the parties, the Court will schedule an in-person status conference to review further proceedings. Signed by Judge Richard A. Hertling. (tbss) Service on parties made. (Entered: 07/24/2024) |
| 07/30/2024 | 20 | STATUS CONFERENCE ORDER: **Status Conference set for 8/21/2024 at 10:00 AM EDT in Courtroom 5 before Judge Richard A. Hertling.** Signed by Judge Richard A. Hertling. (tbss) Service on parties made. (Entered: 07/30/2024) |
| 08/01/2024 | | Scheduled Proceeding Hearing Set: Status Conference set for 8/21/2024 10:00 AM in Courtroom 5 before Judge Richard A. Hertling. (tb) (Entered: 08/01/2024) |
| 08/14/2024 | 21 | STATUS CONFERENCE ORDER: **The Status Conference previously set to occur in-person on 8/21/2024 at 10:00 AM EDT will take place as scheduled but will now take place in Chambers (Telephonic) before Judge Richard A. Hertling.** Signed by Judge Richard A. Hertling. (tbss) Service on parties made. (Entered: 08/14/2024) |
| 08/14/2024 | | **REVISED** Scheduled Proceeding Hearing Set: Status Conference set for 8/21/2024 10:00 AM in Chambers (Telephonic) before Judge Richard A. Hertling. (fm) (Entered: 08/14/2024) |
| 08/21/2024 | | Minute Entry - Was the proceeding sealed to the public? No. If Yes, only parties to the case may order a copy of the transcript. Proceeding held in Washington, DC (Telephonic) on 8/21/2024 before Judge Richard A. Hertling: Status Conference. [Total number of days of |

| | | |
|---|---|---|
| | | proceeding: 1]. Official record of proceeding taken via electronic digital recording (EDR). To order a certified transcript or an audio recording of the proceeding, click HERE. (fm) (Entered: 08/21/2024) |
| 08/21/2024 | 22 | ORDER: If it elects to do so, the defendant shall file a motion to certify the case for an interlocutory appeal under 28 USC § 1292(d)(2) by **9/23/2024; Response due by 9/30/2024; Reply due by 10/4/2024**. If the defendant does not file such a motion, the parties shall file a joint status report by **9/30/2024**. Signed by Judge Richard A. Hertling. (agg) Service on parties made. (Entered: 08/21/2024) |
| 08/22/2024 | 23 | Unopposed MOTION for Extension of Time to File until 10/11/2024 to reply in support of potential motion to certify for interlocutory appeal , filed by USA.**Response due by 9/5/2024.**(Kruser, Rebecca) (Entered: 08/22/2024) |
| 08/23/2024 | | ORDER Granting 23 Motion for Extension of Time. **Reply due by 10/11/2024.** Issued by Judge Richard A. Hertling. (agg) Service on parties made. (Entered: 08/23/2024) |
| 08/26/2024 | 24 | Notice of Filing Certified Transcript for proceedings held on August 21, 2024 in Washington, D.C. (ac7) (Entered: 08/26/2024) |
| 08/26/2024 | 25 | CERTIFIED TRANSCRIPT of proceedings held on August 21, 2024 before Judge Richard A. Hertling. Total No. of Pages: 1-18. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the transcript, click HERE. Notice of Intent to Redact due 9/2/2024. Redacted Transcript Deadline set for 9/23/2024. Release of Transcript Restriction set for 11/21/2024. (ac7) (Entered: 08/26/2024) |
| 09/18/2024 | 26 | Unopposed MOTION for Extension of Time to File until October 7, 2024 to motion to certify the case for an interlocutory appeal , filed by USA.**Response due by 10/2/2024.**(Kruser, Rebecca) (Entered: 09/18/2024) |
| 09/18/2024 | | ORDER Granting 26 Motion for Extension of Time to certify the case for an interlocutory appeal. **Motion due by 10/7/2024.** Issued by Judge Richard A. Hertling. (agg) Service on parties made. (Entered: 09/18/2024) |
| 10/07/2024 | 27 | MOTION to Certify Interlocutory Appeal *and to stay further proceedings*, filed by USA.**Response due by 10/21/2024.**(Kruser, Rebecca) (Entered: 10/07/2024) |
| 10/14/2024 | 28 | RESPONSE to 27 MOTION to Certify Interlocutory Appeal *and to stay further proceedings* , filed by All Plaintiffs.**Reply due by 10/21/2024.** (Bowman, Frank) (Entered: 10/14/2024) |

**Appx48**

| 10/15/2024 | 29 | ORDER: The Court will hold a hearing on the defendant's 27 motion to certify the case for an interlocutory appeal on **10/24/2024 01:30 PM** at the National Courts Building (717 Madison Pl., NW) in Washington, D.C. Signed by Judge Richard A. Hertling. (iab) Service on parties made. (Entered: 10/15/2024) |
| 10/16/2024 | | Scheduled Proceeding Hearing Set: REPORTER PRESENT. Hearing set for 10/24/2024 01:30 PM in Courtroom 6 before Judge Richard A. Hertling. (tb) (Entered: 10/16/2024) |
| 10/17/2024 | 30 | RESPONSE to 27 MOTION to Certify Interlocutory Appeal *and to stay further proceedings Ltr enclosing sources and correcting citation*, filed by All Plaintiffs.**Reply due by 10/24/2024.** (Bowman, Frank) (Entered: 10/17/2024) |
| 10/18/2024 | 31 | REPLY to Response to Motion re 27 MOTION to Certify Interlocutory Appeal *and to stay further proceedings* , filed by USA. (Kruser, Rebecca) (Entered: 10/18/2024) |
| 10/22/2024 | | **REVISED** Scheduled Proceeding Hearing Set: REPORTER PRESENT. Hearing set for 10/24/2024 01:30 PM in Courtroom 6 (Telephonic) before Judge Richard A. Hertling. (fm) (Entered: 10/22/2024) |
| 10/24/2024 | 32 | UNREPORTED OPINION: The defendant's 27 motion to certify interlocutory appeal is granted. The prior order 19 denying the motion to dismiss will be amended to reflect that this case meets the criteria for an appeal pursuant to 28 U.S.C. § 1292(d)(2). Signed by Judge Richard A. Hertling. (iab) Service on parties made. (Entered: 10/24/2024) |
| 10/24/2024 | 33 | AMENDED ORDER: For the reasons provided in the 10 memorandum opinion filed on 7/24/2024, the defendant's 7 motion to dismiss is **DENIED**. The defendant's 27 motion to certify interlocutory appeal pursuant to 28 U.S.C. § 1292(d)(2) is **GRANTED**. The defendant's 27 motion to stay further proceedings pending appeal is **GRANTED**. Further proceedings, including the filing of the answer and any discovery, are **STAYED**. If the Court of Appeals does not accept the appeal, this stay shall terminate automatically. If the Court of Appeals accepts the appeal, the parties shall file a notice within five (5) days of the completion of briefing of the appeal. Signed by Judge Richard A. Hertling. (iab) Service on parties made. (Entered: 10/24/2024) |

---

## PACER Service Center

**Appx49**

| Transaction Receipt | | | |
|---|---|---|---|
| 10/24/2024 22:26:03 | | | |
| **PACER Login:** | rebeccakruser | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-01876-RAH |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |